NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5589-13T3

PHIBRO ANIMAL HEALTH
CORPORATION,

     Plaintiff-Appellant,

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,

     Defendant-Respondent.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| July 14, 2016 |
| APPELLATE DIVISION |

Argued February 29, 2016 — Decided July 14, 2016

Before Judges Sabatino, Accurso and O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-0538-12.

Steven J. Pudell argued the cause for appellant (Anderson Kill, P.C., attorneys; Mr. Pudell and Janine M. Stanisz, on the briefs).

Mark D. Sheridan argued the cause for respondent (Squire Patton Boggs (US) LLP, attorneys; Mr. Sheridan, Jason F. King and Sean P. Neafsey, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This case is about insurance coverage and undersized broiler chickens.  The insured, Phibro Animal Health Corporation

("Phibro"), appeals the trial court's decision granting summary judgment to the insurer, defendant National Union Fire Insurance Company ("National Union"). Phibro, an animal product manufacturer, sought a declaratory ruling that National Union was required to provide coverage for economic losses sustained by three of Phibro's customers. The customers raised broiler chickens for human consumption. The growth of the chickens was stunted because they had ingested a Phibro drug intended to control a common intestinal disease.

The trial court found there was no covered "occurrence" or "property damage" under the insuring clauses of the National Union policies. The court also found the policies' "impaired property" exclusion barred coverage, but that the contractual liability and professional liability exclusions did not apply. In addition, the court ruled Phibro had waived its right to indemnification for customer claims that Phibro had settled without National Union's consent.

For the reasons that follow, we reverse the grant of summary judgment to National Union. Applying the controlling principles of coverage law to the terms of National Union's policy and the factual record, we conclude the circumstances here qualify as both a covered occurrence and property damage.

We also rule the economic loss doctrine does not bar coverage of these claims.

The question of potential exclusion, however, must be remanded to the trial court for further consideration. We agree with the court's ruling that the contractual liability and professional liability exclusions do not apply. However, the present factual record is inadequate from the written submissions to determine whether the affected chickens could have been "restored to use" so as to fall within the impaired property exclusion. If, on remand, the trial court determines on a fuller factual record that the impaired property exclusion does not bar coverage, it must then evaluate whether Phibro's settlements with its three customers, which National Union declined to indemnify, were reasonable.

I.

Phibro, a maker of animal health products, purchased a Commercial General Liability Insurance policy (the "CGL policy") and an Umbrella Prime Insurance policy (the "Umbrella policy") (together, "the policies") from National Union for the policy period of April 1, 2010 through April 1, 2011. The standard insuring clauses for bodily injury and property damage liability under the CGL policy provided insurance coverage for "sums that the insured becomes legally obligated to pay . . . because of

. . . 'property damage' to which this insurance applies." The CGL policy had a limit of liability of $2,000,000 per occurrence and $4,000,000 in the aggregate. The Umbrella policy provided coverage of $25,000,000 for liability in excess of the CGL policy limits. The policies specified various exclusions to which the insurance would not apply.

In the summer or fall of 2009,[1] Phibro began selling a product known as Aviax II ("Aviax") in the United States as an additive for chicken feed. Aviax is designed to prevent coccidiosis, a protozoal parasitic disease.

In the spring of 2010, three Phibro customers reported that although Aviax had successfully prevented coccidiosis, it also stunted the growth of their chickens. The stunted growth resulted in lower meat production, increased feed costs, and increased processing costs. The undersized chickens were nevertheless sold for human consumption, although not at the sizes normally anticipated.

From August 2010 through August 2011, Phibro funded four studies at the University of Georgia and a commercial performance study in Mexico to determine if Aviax had contributed to the adverse effects reported by its customers.

---

[1] The record is inconsistent as to the actual time when Aviax was introduced into the market.

A-5589-13T3

Based on those studies, Phibro concluded that Aviax had, in fact, "caused a significant decrease in feed consumption and poor conversion of the feed the birds consumed to meat," resulting in stunted growth. According to Phibro's counsel, Phibro has not marketed Aviax in the United States since these events, and does not intend to resume doing so until the issues that led to the damage are resolved.

In August 2010, Phibro filed a notice of claim with National Union's affiliate, Chartis Insurance Company,[2] regarding Phibro's potential liability for customer claims related to Aviax and National Union's potential obligation to indemnify Phibro. None of those claims were by any individual consumers who had purchased chickens.

Phibro notified National Union in September 2010 that the alleged damages relating to Aviax exceeded the $2,000,000 limit of the CGL policy. Phibro requested authority to settle with one of the three customers, identified anonymously in this record as Customer A.[3] National Union responded that it would

---

[2] Although the investigation and processing of Phibro's claim was conducted by Chartis on behalf of National Union, for simplicity we refer at all times to National Union rather than to Chartis as its affiliate.

[3] Phibro's customers have been fictitiously designated as "A," "B," and "C" by the parties to protect their identities. The
(continued)

not consent to the settlement. Nevertheless, Phibro proceeded with the settlement, and issued a check to Customer A for its claimed losses.

In October 2010, National Union responded to the notice of claim, informing Phibro that it had "undertaken an investigation to determine whether there may be coverage under [the policies.]" The investigation was "subject to a full reservation of [National Union's] rights . . . including . . . the right to assert that [it] has no duty to defend or indemnify Phibro."

National Union hired Morgan Johnson Carpenter & Company ("MJC"), a forensic accounting firm, to review the damages claimed by the three customers. MJC issued reports in June 2011 for Customers A and B, and in July 2011 for Customer C. MJC determined that, due to increased feed costs and smaller chickens, Customer A sustained losses of a certain amount, Customer B sustained losses of a higher amount, and Customer C sustained losses of an even higher amount.

In December 2011, National Union orally informed Phibro at a meeting that it would deny coverage for the claims and losses. The record does not contain formal documentation from National

---

(continued)
record is sealed in that respect pursuant to a confidentiality order.

A-5589-13T3

Union denying such coverage, although the denial is undisputed.

Thereafter, in January 2012, Phibro filed a product defect report[4] with the United States Food and Drug Administration ("FDA"). Among other things, the FDA submission reported that "[p]erformance changes (compared to historical [levels]) were the only adverse effects that were noted" after Aviax was included in the customers' chicken feed. The submission also stated that "there were no coccidiosis problems and no increases in flock mortality."

Having been rebuffed by National Union, Phibro filed a complaint in the Law Division in January 2012, seeking a declaratory judgment that National Union is obligated under the policies to provide coverage for the property damage sustained by Customers A, B, and C. Phibro further alleged that National Union had breached the insurance contract and the implied covenant of good faith and fair dealing. The complaint sought compensatory and punitive damages.

Meanwhile, in July 2012, Customer B filed a complaint against Phibro in the court of another state, alleging that Aviax had stunted the growth of its chickens, causing damages. Customer B pled causes of action for negligence, breach of

---

[4] The full title of the report is "Veterinary Adverse Drug Reaction, Lack of Effectiveness, Product Defect Report."

express and implied warranties, and strict liability. National Union notified Phibro that it would defend the insured in that lawsuit, but reserved its right to deny coverage under the policies. National Union's motion to stay the New Jersey proceedings pending the outcome of Customer B's lawsuit was denied.

Subsequently, National Union moved for summary judgment seeking a declaration that it has no obligation to cover Phibro for these claims. Phibro cross-moved for summary judgment, urging an opposite declaration finding coverage.

On June 24, 2014, the trial court issued a written decision granting National Union's motion, and denying Phibro's cross-motion. The court concluded that the alleged losses sustained by Phibro's customers did not constitute "property damage" caused by an "occurrence," as those terms are defined in the insuring clauses of the policies. The trial court reasoned that because the chickens "were not physically injured and were subsequently sold for human consumption," there was no "property damage" sustained.

Further, the trial court found that Phibro's customers sustained purely economic losses and are thus limited to contractual remedies under what is described in case law as the "economic loss" doctrine. Finding the damages "were entirely

foreseeable," the court concluded that tort remedies are unavailable to Phibro's customers. Citing our Supreme Court's opinion in <u>Weedo v. Stone-E-Brick, Inc.</u>, 81 <u>N.J.</u> 233, 240-41 (1979), the court ruled that "[u]nder New Jersey law, breaches of contract, without the potential for tort liability, do not qualify as an 'occurrence' under general liability policies."

The trial court also ruled that even if there were potential coverage under the insuring clauses, the policies' "impaired property" exclusion also bars Phibro's claim. The court did, however, find the separate "contractual liability" and "professional liability" exclusions invoked by National Union do not apply.

Lastly, the trial court held Phibro waived its right to any indemnification by National Union for any claims related to Customer A by settling with that customer without National Union's consent.

Phibro appealed. In the meantime, Phibro settled with Customer B in July 2014, resulting in the dismissal of Customer B's lawsuit. Phibro has also since settled with Customer C. The amounts and details of these settlements are not disclosed in the record, and they do not bear upon our analysis.

We review the issues raised on appeal by Phibro employing a de novo standard of review. We apply that standard for two reasons. First, the challenged rulings were made in an order granting summary judgment, determining that National Union is entitled to dismissal of Phibro's complaint as a matter of law. W.J.A. v. D.A., 210 N.J. 229, 237-38 (2012) (instructing that appellate courts review orders granting summary judgment on a de novo basis). Second, "[b]ecause the interpretation of an insurance contract is a question of law . . . the trial judge's coverage determination [is reviewed] de novo." Ohio Cas. Ins. Co. v. Island Pool & Spa, Inc., 418 N.J. Super. 162, 168 (App. Div.), certif. denied, 206 N.J. 329 (2011).

Certain overarching tenets of coverage law guide our analysis. "[W]ell-settled principles governing the interpretation of contracts of insurance . . . mandate broad reading of coverage provisions, narrow reading of exclusionary provisions, resolution of ambiguities in the insured's favor, and construction consistent with the insured's reasonable expectations." Sealed Air Corp. v. Royal Indem. Co., 404 N.J. Super. 363, 375 (App. Div.), certif. denied, 196 N.J. 601 (2008) (quoting Search EDP, Inc. v. Am. Home Assurance Co., 267 N.J. Super. 537, 542 (App. Div. 1993), certif. denied, 135 N.J. 466

(1994)).  In addition, an insurance policy "must be considered as a whole and effect given to every part thereof."  Herbert L. Farkas Co. v. N.Y. Fire Ins. Co., 5 N.J. 604, 610 (1950). "Generally, [the policy] should be interpreted according to its plain and ordinary meaning."  Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175 (1992).

## A.

We begin with an examination of what are commonly known as the "insuring provisions" of National Union's policies.  In particular, we consider whether the losses associated with the growth-stunting effects of Phibro's product constitute "occurrences" and "property damage" within the meaning of the insuring provisions.  Unlike the trial court, we conclude they do.  On a related point, we part company with the trial court's finding that the liability claims against Phibro by its customers are, by their inherent nature, outside of the policies' scope of coverage under the so-called "economic loss" doctrine.

## 1.

The policies afford coverage for "sums that the insured becomes legally obligated to pay" for "'property damage' . . . caused by an 'occurrence.'"  "Occurrence" is defined by the CGL policy as "an accident, including continuous or repeated

exposure to substantially the same general harmful conditions." The term "accident," as it is used within the concept of an occurrence, is not defined in the policies. Hence, we turn to case law for guidance on that latter term.

Our Supreme Court has recognized that "the accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury." Cumberland Mut. Fire Ins. Co. v. Murphy, 183 N.J. 344, 349 (2005) (citing Voorhees, supra, 128 N.J. at 183). A covered "accident," under this conceptual approach, "includes the unintended consequences of an intentional act, but not an injury that is, itself, intended." Ibid. (citing Voorhees, supra, 128 N.J. at 182).

A pivotal question under the insuring clauses here is thus whether the stunted growth of the chickens allegedly caused by their consumption of Aviax was an "accident." National Union contends the undersized chicken problem was not accidental, because that adverse side effect could have been a foreseeable consequence of the chickens ingesting Aviax. We reject that argument for several reasons.

The Supreme Court has not declared that foreseeability, at least in the broadest sense of that term, is an all-purpose litmus test for treating harms as non-accidental for purposes of

coverage analysis. For instance, a prudent individual who purchases insurance in case some form of accident might occur in the future does not lose that protection just because he or she can "foresee" in the abstract a possible need for coverage. If foreseeability were construed that broadly to disallow coverage, then no sensible person would ever pay a premium.

We recognize that our case law in coverage disputes at times has looked to whether an unintended consequence was "expected" by an insured. See, e.g., Voorhees, supra, 128 N.J. at 183; Broadwell Realty v. Fid. & Cas. Co., 218 N.J. Super. 516, 534 (App. Div. 1987). Even so, the factual record does not demonstrate that Phibro expected, foresaw, or anticipated the growth of its customers' chickens would be stunted if they ingested Aviax.

To the contrary, the record suggests Phibro was caught off guard by this adverse side effect. A manufacturer naturally would not have wanted to market this feed additive if it knew in advance its customers' chickens would experience such an undesirable reaction. In this regard it is instructive that Phibro has stopped selling Aviax in the United States despite its effectiveness for its intended purpose.

In sum, the law and the record amply support Phibro's argument that the stunted growth of the Aviax-ingesting chickens was a non-accidental "occurrence" under the policies.

2.

We reject National Union's contention there was no covered "occurrence" here because the harm to the affected chickens resulted in only economic losses. National Union, as did the trial court, largely relies upon the Supreme Court's opinion in Weedo, supra, 81 N.J. at 240-41, involving the construction of a form CGL policy issued in 1973 by the Insurance Services Organization ("ISO").[5] For several reasons, National Union's reliance on Weedo is misplaced.

In Weedo, a masonry contractor was sued for breach of contract and faulty workmanship. Id. at 235. The damages claimed were "the cost of correcting the work itself." Ibid. The contractor sought defense and indemnification from its insurer under a CGL policy that required the insurer to pay "on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an

---

[5] "The [ISO] is an association of domestic property and casualty insurers. One of the ISO's services is to develop standard policy forms for member insurers." E.I. Du Pont de Nemours & Co. v. Admiral Ins. Co., 711 A.2d 45, 52 n.7 (Del. Super. Ct. 1995).

occurrence." Id. at 237 (emphasis omitted). The 1973 ISO policy considered by the Court in Weedo also contained exclusionary clauses, referred to by the Court as "business risk" provisions, which barred coverage for "property damage to the named insured's products arising out of such products or any part of such products" (the so-called "insured's product" exclusion) and "property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith" (the so-called "work performed" exclusion). Id. at 241.

The Court in Weedo observed that harms to a dissatisfied customer stemming from the insured's faulty goods or work are potentially compensable under contract law, and thus comprise a "business expense, to be borne by the insured-contractor in order to satisfy customers." Id. at 239. It recognized that the "business risk" exclusions were "intended to convey this concept," id. at 241, and that the exclusions were "a valid limitation upon standard, readily-available liability insurance coverage." Id. at 245.

Weedo does not control the interpretation and application of the insuring clauses in National Union's policies here. Importantly, the Supreme Court did not adjudicate in Weedo

whether there was an "occurrence" under the policy, because the insurer had "conceded . . . that[,] but for the exclusions in the policy, coverage would obtain." Id. at 237-38 n.2.

Contrary to National Union's assertions, Weedo did not hold that "the consequences of not performing well were not covered and were to be borne by the insured," under the general insuring clauses of the 1973 ISO Form CGL policy. Rather, Weedo more narrowly held that the "business risk" exclusions — designed to allocate risk to the insured for certain damages caused by its poor performance — were not ambiguous even when read together with another exclusion in the policy that could be interpreted to expand coverage to those same occurrences that had been excluded. Id. at 245-48.

The Court observed that the "business risk" exclusions themselves were clear and that exclusionary provisions are generally "meant to be read . . . independently of every other exclusion." Id. at 248. The Court then reasoned that the language at issue could not be combined with language from another exclusion to create an "artificial ambiguity" that would lead to an exclusionary provision granting additional coverage beyond what a reasonable insured could have expected, rather than subtracting from it. Id. at 245-48. Hence, the "business risk" exclusions barred coverage for repairing the insured's

faulty work.  <u>Ibid.</u>

Significantly here, the 1973 ISO version of the CGL policy involved in <u>Weedo</u> differs from the 2007 ISO Form used for the CGL policy National Union issued to Phibro and the 2009 ISO Form used for the Umbrella policy.  The 1973 ISO Form defined the term "occurrence," in relevant part, as "an accident . . . which results in . . . property damage neither expected nor intended from the standpoint of the insured."

By contrast, the 2007 and 2009 ISO Forms that are at issue here instead define an occurrence, in part, as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[6]  Hence, <u>Weedo</u>'s construction of the 1973 ISO Form does not control this case, which involves newer ISO forms containing different definitional language.

After <u>Weedo</u>, in <u>Aetna Casualty & Surety Co. v. Ply Gem Industries, Inc.</u>, 343 <u>N.J. Super.</u> 430, 444-50 (App. Div.), <u>certif. denied</u>, 170 <u>N.J.</u> 390 (2001) ("<u>Ply Gem</u>"), we addressed whether claims for economic losses could qualify as an

_____

[6] Although neither use the "expected or intended" language within any of its definitions, both the 2007 and 2009 ISO Forms do contain separate exclusions for bodily injury and property damage "expected or intended from the standpoint of the insured."  This does not alter our conclusion that the Court's interpretation of the 1973 ISO Form in <u>Weedo</u> does not apply to the general insuring clauses of the 2007 and 2009 forms at issue here.  Moreover, as we discussed <u>supra</u>, we do not find that Phibro expected or intended the adverse side effects of Aviax.

"occurrence" covered by a CGL policy. The insurer in Ply Gem contended there was no coverage under a CGL policy for claims against an insured manufacturer of defective fire retardant plywood ("FRTP"). Id. at 433. The insurer argued that, because the trial court had dismissed "strict liability and negligence claims against [the insured] on the grounds that these were economic losses recoverable under [the Uniform Commercial Code] and breach of contract theories," those claims therefore were not covered "occurrences" under the policy. Id. at 444.

The trial court and this court rejected the insurer's arguments in Ply Gem. We observed that, in an insurance context as opposed to the context of a harmed plaintiff's own lawsuit, "the issue was not whether the FRTP plaintiffs could recover in tort, or whether they were relegated to [contract] remedies available under the UCC." Id. at 445. We noted in Ply Gem the pivotal question was whether, "regardless of the nature of the cause of action against [the insured], the damages [the FRTP] plaintiffs suffered and for which [the insured] was deemed liable fell within the coverage offered by [the insurer's] policies." Ibid. (emphasis added). We further noted in Ply Gem the Supreme Court in Weedo "made it clear that the theory upon which the plaintiff proceeded [against the insured] was irrelevant to a determination of whether there was a covered

18

'occurrence' under the CGL." Id. at 447.

We held in Ply Gem that the insurer had a duty to defend the claims against the insured for damages to property other than the FRTP itself. Id. at 450. Likewise here, as we discuss in more depth, infra, the damage caused by Aviax was not to Phibro's product itself. Instead the damage was to the customers' chickens that ingested the food additive.

This more limited interpretation of Weedo is consistent with our recent opinion in Cypress Point Condominium Assoc., Inc. v. Adria Toners, LLC, 441 N.J. Super. 369 (App. Div.), certif. granted, 223 N.J. 355 (2015).[7] In Cypress Point, the issue was whether a developer's CGL policy covered claims brought by a condominium association for consequential damages resulting from the defective work of subcontractors. The subcontractors failed to properly install the roof, flashing, gutters, brick façade, windows, doors, and sealants. Id. at 373. The plaintiff condominium association did not argue the replacement costs of these particular items were covered by the policy. Id. at 374. Instead, the association sought recovery for damages the faulty workmanship caused to sheetrock, insulation, floors, wall finishes, and other such portions of

---

[7] The Supreme Court recently heard oral argument in Cypress Point. No opinion has been issued as of this date.

the individual units as well as in the common areas. Ibid. The question before us was whether these consequential damages constituted "property damage" and an "occurrence" under the policy.

We concluded in Cypress Point that the consequential damages were "property damage" because they "clearly constitute 'physical injury to tangible property.'" Id. at 377. Further, the damages resulted from an "occurrence" because the subcontractors did not expect or intend for their faulty workmanship to cause property damage and because the damages "amount[ed] to an unexpected and unintended 'continuous or repeated exposure to substantially the same general harmful conditions.'" Ibid.

We distinguished Weedo in Cypress Point, noting the Supreme Court did not consider in Weedo whether faulty work performed by the insured defendant contractor was "property damage" or an "occurrence," because the insurer had conceded that "but for the exclusions in the policy, coverage would obtain." Cypress Point, supra, 441 N.J. Super. at 377-78. Further, the damages at issue in Weedo were the cost of replacing the defective work itself, not the cost of repairing or replacing other property damaged by the defective work, that is consequential damages.

Id. at 378.[8]

The Cypress Point panel concluded that the damages to the common areas and individual units fell within the definitions of property damage and occurrence. Id. at 377. The point we made in Cypress Point, which we reiterate here, is that the business risk doctrine relates only to the exclusions to coverage contained in a CGL policy and should not be read into the general insuring clauses of those policies. Thus, we conclude that the damage to the chickens is an occurrence covered by the policies.

3.

The next disputed question under the insuring clauses is whether the diminished size and weight of the chickens represents a form of covered "property damage." The policies define property damage as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or, alternatively, "[l]oss of use of tangible property that is not physically injured."

---

[8] In Cypress Point, we also distinguished another case on which National Union relies, Firemen's Insurance Co. of Newark v. National Union Fire Insurance Co., 387 N.J. Super. 434 (App. Div. 2006). We held in Firemen's there was no covered "property damage" because the damages claimed in that case were to replace defective work, i.e., sub-standard firewalls, and did not involve consequential damages. Cypress Point, supra, 441 N.J. Super. at 378.

Phibro argues that Aviax caused "physical injury" to its customers' property by stunting the growth of the chickens and causing them to produce less meat. Phibro contends the fact that the undersized chickens could still be sold does not mean that no physical injury to them was sustained. Although the chickens would grow after Aviax was removed from their feed, Phibro maintains that the damages from stunted growth were "locked-in" because of production constraints and deadlines. Stunted growth caused a loss of meat production and lost profits, which Phibro maintains also constitute a "loss of use of tangible property." Phibro also contends that it reasonably expected that third-party property damage of its customers would be covered by the policies.

National Union argues in opposition that stunted growth is not a "physical injury." It points out that once Aviax was removed from the chickens' diets, their appetites returned, and they grew and gained weight. National Union also stresses that the affected chickens were sold for human consumption.

Although National Union agrees that "[i]t is beyond dispute that the chickens grew at a slower rate while consuming chicken feed that included . . . Aviax," National Union contends that "'stunted growth' and 'weight suppression' without permanent injury to the chickens does not constitute 'physical injury'

22

where there is no evidence of a physiological change." Relying on an unpublished Minnesota case, National Union argues that there can be no physical injury without physiological damage and necropsies performed by Phibro on the affected chickens failed to show any physiological harm. National Union further argues that there was "no complete loss of use of the chickens," and "'lower meat production' is not a 'loss of use.'"

We agree with Phibro that the situation here qualifies as property damage within the meaning of the policies' insuring clauses. Several reasons support that conclusion.

With respect to the "physical injury" prong of the property damage definition, in a decision interpreting the analogous phrase "direct physical loss" under a Warehouseman's Liability policy, we adopted a broad notion of the term "physical." We noted that "[s]ince 'physical' can mean more than material alteration or damage, it was incumbent on the insurer to clearly and specifically rule out coverage in the circumstances where it was not to be provided." Customized Distrib. Servs. v. Zurich Ins. Co., 373 N.J. Super. 480, 491 (2004), certif. denied, 183 N.J. 214 (2005). We recognized that "any ambiguity on the point should be resolved in favor of coverage." Ibid.

Several courts in other jurisdictions have found the appropriate meaning of the phrase "physical injury" in this

context is "an alteration in appearance, shape, color or in other material dimension." Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Terra Indus., Inc., 216 F. Supp. 2d 899, 917 (N.D. Iowa 2002) (emphasis added), aff'd, 346 F.3d 1160 (8th Cir. 2003), cert. denied, 541 U.S. 939, 124 S. Ct. 1697, 158 L. Ed. 2d 360 (2004); see also Fid. & Deposit Co. of Md. v. Hartford Cas. Ins. Co., 215 F. Supp. 2d 1171, 1183 (D. Kan. 2002); F&H Constr. v. ITT Hartford Ins. Co. of Midwest, 12 Cal. Rptr. 3d 896, 905 (Ct. App. 2004); Capstone Bldg. Corp. v. Am. Motorists Co., 67 A.3d 961, 982 (Conn. 2013); Traveler's Ins. Co. v. Eljer Mfg., Inc., 757 N.E.2d 481, 496 (Ill. 2001); Summit Custom Homes, Inc. v. Great Am. Lloyds Ins. Co., 202 S.W.3d 823, 828 (Tex. Ct. App. 2006). Although the notion of an "alteration" is not synonymous with "injury," the courts in these cases were plainly referring to detrimental alterations. Physical injury has also been defined as "damage or harm to the physical condition of a thing." Farm Bureau Mut. Ins. Co. of Am. v. Earthsoils, Inc., 812 N.W.2d 873, 876 (Minn. Ct. App.), review denied, No. A11-0693 (Minn. 2012) ("Earthsoils").

Guided by these various authorities that shed light on the plain meaning of the policy term "physical injury," we conclude the chickens' stunted growth here qualifies as such. Undoubtedly, the undisputed smaller sizes of the broiler

chickens could be considered an alteration of "other material dimension," even if stunted growth is not within the meaning of the terms "appearance" or "shape." Simply stated, stunted growth represents harm to the physical condition of the chickens.

There is no support in the language of the policies for National Union's assertion that there must be physiological damage to meet the physical injury requirement.[9] Moreover, it is not self-evident that stunted growth is not a form of physiological damage. The term "physiological" has been defined to be "characteristic of or appropriate to an organism's healthy or normal functioning." Merriam-Webster's Collegiate Dictionary 935 (11th ed. 2014). Stunted growth surely is not normal functioning.

The fact that the chickens here were sold for human consumption is not dispositive of whether there was property damage. The term "physical injury" under the policies does not require that the property that is damaged be unsalable. Neither the trial court nor National Union have cited any authority that supports the argument that the chickens could not be physically

---

[9] National Union has cited one unpublished case holding physiological damage is required to meet the "physical injury requirement." Pursuant to Rule 1:36-3, we decline to discuss the unpublished case, which does not persuade us in any event.

injured if they were sold for human consumption, irrespective of their size and weight.

We are cognizant that the chickens might have recovered their lost weight if given sufficient time after removing Aviax from their diet. But that possibility does not establish that there was no property damage. The point is refuted by an affidavit[10] from Dr. Hector Cervantes, Senior Manager for Poultry Technical Services at Phibro. Dr. Cervantes explained that:

> The lifecycle for the Customers' Broiler Chickens is generally forty-two (42) days from the day of chick placement at the farm to slaughter. . . .
>
> Uniformity of size is critically important to the Customers, in part because it represents the quality of their bird product and because automated processing plant equipment cannot be properly adjusted when variations in size exceed the "normal" range.

In addition, Dr. Cervantes addressed the commercial significance of such delayed growth:

> Allowing the birds to grow longer than their normal slaughter date would not have solved the problem because as they grow older, their mortality rate rises and the lack of uniformity in size would have persisted. Moreover, modern poultry

---

[10] Although the affidavit is presented within a confidential appendix, we are free to discuss it because counsel at oral argument on appeal advised that they are only interested in preserving the confidentiality of the Customers' identities and the amounts of their respective claims and settlements.

operations such as those conducted by the Customers are highly mechanized, and highly scheduled, operations that depend on uniform and consistent processing of birds from hatching to the pre-determined slaughter age, with distinct groups of birds moving through the system one right after the other using the available facilities and feed and other resources dedicated to each stage of growth. In addition to the increased time and cost of taking longer to feed the birds until they reach the targeted slaughter weight, there would not have been space available to house those birds as the younger birds work their way through the system. Thus, once the scheduled slaughter date arrived for the Customers' chickens affected by Aviax, the Customers' losses were locked-in.

Because the facts are to be viewed on summary judgment in the light most favorable to Phibro, see Rule 4:46-2, we must accept for purposes of National Union's dispositive motion that it was commercially infeasible to delay the slaughter of the chickens that consumed Aviax. Thus, even though the chickens might have recovered given enough time, accepting as true the facts as alleged by Phibro, the damage occurred at the pre-determined slaughter date if it were economically infeasible to delay slaughter.[11]

---

[11] We discuss, infra, at Point III(A)(3) whether coverage for the property damage is nullified under the "impaired property" exclusion if National Union persuades a fact-finder that the chickens feasibly could be "restored to use."

In sum, the stunted growth of the chickens qualified as a "physical injury," subject to the caveat of potential restoration we discuss later in this opinion.

4.

Although we have found "physical injury" exists here, for sake of completeness, we address the second alternate prong of the "property damage" definition, that is, whether there was a "[l]oss of use of tangible property that is not physically injured." Citing Heldor Industries, Inc. v. Atlantic Mutual Insurance Co., 229 N.J. Super. 290, 397-98 (App. Div. 1988), National Union argues that "a claim for property value loss and lost business profits only qualifies as 'property damage' if there is underlying physical property damage to a third party." However, in Heldor, we were not addressing the "loss of use" provision in the definition of property damage, but instead were considering whether alleged diminished property values resulting from faulty pool construction constituted property damage to a third party that would not be subject to the "business risk" exclusions. Ibid.

National Union also relies on Great American Insurance Co. v. Lerman Motors, Inc., 200 N.J. Super. 319 (App. Div. 1984), but that decision does not control the present case. In Great American, we considered whether, once "property damage" was

established by physical injury to tangible property, the insurer was obligated to cover consequential damages such as lost profits in addition to claims for damages to tangible property. Id. at 323-24. Although we found "[t]he obligation to pay all damages for the loss of use of property resulting from its injury or destruction is inclusive of consequential damages, including loss of profits or business, flowing from the loss[,]" id. at 326, we were addressing the "loss of use" provision in the "property damage" definition because the case involved a claim for consequential losses flowing from fire damage to the premises of a car dealership. Id. at 322-23. Because the dealership property had been obviously damaged, we did not address in Great American whether the claim could qualify as "loss of use of tangible property which has not been physically injured or destroyed." Id. at 323.

Notably, in considering the Heldor decision in the context of the "loss of use" prong of the property damage definition, the federal district court in New Jersey has observed that if Heldor's restriction of coverage for consequential damages to those flowing from physical damage to tangible property "applied to all cases involving property damage and consequential damages, it would render the loss of use provision meaningless." Elizabethtown Water Co. v. Hartford Cas. Ins. Co., 998 F. Supp.

447, 454 (D.N.J. 1998). In <u>Elizabethtown Water Co.</u>, the insured water company failed to adequately supply water to a new development. <u>Id.</u> at 449-50. There was no physical injury to the property but the court recognized that the "developers could not use their property for its intended use because no person would purchase a lot or house that did not have an adequate water supply." <u>Id.</u> at 454. Finding that "<u>Heldor</u>'s limitation does not . . . comport with the second prong of the definition of property damage," the district court held that real estate developers suffered a coverable "loss of use" of their property subject to an exclusion not relevant here. <u>Ibid.</u>

National Union also relies on <u>Earthsoils</u>, <u>supra</u>, 812 <u>N.W.</u>2d at 873. However, the court in that Minnesota case was not addressing the "loss of use" definition of property damage, <u>id.</u> at 876 n.2, but rather was considering whether the failure to achieve an anticipated crop yield was "physical injury to tangible property." <u>Id.</u> at 876-78. The court found that the "failure to achieve anticipated crop yield is not itself physical injury to tangible property" noting that "a crop that never existed is not tangible property." <u>Id.</u> at 878.

National Union argues that, like the unrealized crop yield in <u>Earthsoils</u>, "[c]hicken meat/weight that never existed in the first instance cannot be considered to be tangible property."

However, the chickens themselves surely did exist. Assuming it was commercially infeasible to delay the slaughter of the chickens, then Phibro's customers were unable to realize the chickens' full potential for sale, because of the adverse side effects of Aviax. This shortfall qualifies, at the very least, as a partial "loss of use" of the chickens, even if we were to accept the premise that they were not physically injured.

In sum, the stunted growth caused by the chickens ingesting Aviax qualifies under National Union's policies as "property damage" because the chickens were physically injured. Alternatively, even if we were to consider the chickens not physically injured, their stunted growth nonetheless resulted in a partial loss of their use, which independently qualifies as "property damage."

### III.

Having concluded that Phibro's claims for coverage fall within the insuring provisions of the policies, we now consider whether any of the policy exclusions invoked by National Union negate coverage.

The burden of proof is on an insurer to prove that exclusions apply. Generally, "insurance policy exclusions must be narrowly construed; the burden is on the insurer to bring the case within the exclusion." Flomerfelt v. Cardiello, 202 N.J.

432, 442 (2010) (quoting Am. Motorists Ins. Co. v. L-C-A Sales Co., 155 N.J. 29, 41 (1998)); see also Aviation Charters v. Avemco Ins. Co., 335 N.J. Super. 591, 594 (App. Div. 2000) ("Where an exclusionary clause is involved, such clauses are narrowly construed; indeed it is the insurer's burden to establish the exclusion."), aff'd, 170 N.J. 76 (2001).

A.

We first address the impaired property exclusion. "Impaired property" is defined as

> tangible property, other than "your product" or "your work", that cannot be used or is less useful because:
>
> a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
>
> b. You have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.
>
> [(Emphasis added).]

The policy language states that coverage for property damage liability does not apply to

> "[p]roperty damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

[(Emphasis added).]

National Union argues that this exclusion applies because the customers' chickens were damaged by a defect in Phibro's product (and were thus "impaired"), but could be "restored to use" by removing Aviax from their diets.

Phibro counters that this exclusion does not pertain because (1) it does not apply to chickens that were physically injured, (2) the clause applies only to claims for damages to the insured's own product or work and not to damages to third parties, and (3) the affected chickens do not meet the definition of impaired property because Aviax was not "incorporated" into the chickens, there was no "defect, deficiency, or dangerous condition in Aviax," and the chickens could not be "restored to use." We consider these arguments in turn.

1.

In <u>Newark Insurance Co. v. Acupac Packaging, Inc.</u>, 328 <u>N.J.</u> <u>Super.</u> 385, 391-92 (App. Div. 2000), we addressed whether the impaired property exclusion barred coverage under a CGL policy. Like the policies at issue here, the policy in <u>Acupac</u> defined "property damage" as "[p]hysical injury to tangible property" or "[l]oss of use of tangible property that is not physically injured." <u>Id.</u> at 391. The property in question in <u>Acupac</u> consisted of defective foil packages provided by the insured to customers who attached them to advertisement cards to be inserted into magazines. The packages leaked skin cream into the advertisement cards, causing them to be withdrawn from use. <u>Id.</u> at 388-90.

We noted in <u>Acupac</u> that the impaired property exclusion would bar coverage under the "loss of use" provision in the insured's policy "since the damage would be to property not physically injured or impaired arising out of a defect or deficiency in [the insured's] work." <u>Id.</u> at 393. We then considered whether the cards that had not yet been inserted into the magazines, and thus had not yet been subjected to the leaking lotion, were physically injured. <u>Id.</u> at 399-400. In that regard, we determined that there were factual issues that needed to be resolved on remand. <u>Id.</u> at 400. We held that if

the fact-finder concluded that the cards were damaged, the exclusion would not apply unless the fact-finder determined that the cards were only "impaired." Ibid. We recognized that if the cards could not be restored to use, "they were effectively damaged and not merely 'impaired' within the meaning of [the impaired property] exclusion." Id. at 400-01.

Like the policy in Acupac, the definition of "impaired property" in Phibro's CGL policy does not exclude all property that has been physically damaged. The definition only specifies property that cannot be used, or is less useful and can be restored to use. The definition of "property damage" itself includes "[p]hysical injury to tangible property, including all resulting loss of use of that property," (emphasis added), which implicitly recognizes that there can be "loss of use" when property is physically injured. Accordingly, we reject Phibro's argument that the "impaired property" exclusion cannot ever apply when there is proof of physical injury. As we shall discuss, infra, in Part III(A)(3), this exclusion's applicability here instead turns on the factual question of whether that physical harm to the property can feasibly be restored.

We are likewise unpersuaded by Phibro's argument that the "impaired property" exclusion cannot apply where there is damage to third-party property. The definition of "impaired property" itself, which is "tangible property, other than 'your product' or 'your work,'" defeats that argument. Only third-party property qualifies as "impaired property" under that definition. Therefore, even if the ingested Aviax supplement, i.e., the insured's product, has been dissipated, the resulting harm to the chickens owned by Phibro's customers qualifies as damage that has impaired third-party property. The question then becomes whether the nature and permanency of that impairment falls within the terms of this policy exclusion.

Phibro admits that Aviax caused unintended physical injury to its customers' chickens, yet asks us to find that Aviax was not "defective, deficient, inadequate or dangerous" because Aviax was effective in preventing coccidiosis. The term "defective" has been defined as "imperfect in form or function" and "deficient" has been defined as "lacking in some necessary quality or element" or "not up to a normal standard or complement." Merriam-Webster's Collegiate Dictionary 326 (11th ed. 2014). We conclude that Aviax was indeed defective or deficient, as it clearly was imperfect in function and "not up

to a normal standard."

As to the question of whether Aviax was "incorporated" into the chickens, neither party cites to us any case law regarding when "your product" or "your work" can be considered under coverage law to be incorporated into a third party's product. The plain meaning of the term "incorporate" is "to unite or work into something already existing so as to form an indistinguishable whole" or "to blend or combine thoroughly." Merriam Webster's Collegiate Dictionary 631 (11th ed. 2014). Certainly, the chickens were already existing. Aviax, when ingested, became combined with and indistinguishable from the chickens. We agree with National Union that the affected chickens "incorporated" the defective Aviax.

3.

Nonetheless, the affected chickens would be "impaired property" if they could "be restored to use by the repair, replacement, adjustment or removal" of the Aviax. Phibro argues that because of the chickens' pre-determined lifecycle and slaughter dates, they could not be "restored to use." Conversely, National Union contends the impaired property exclusion "contains no time limitation[,]" and that if the chickens had been given more time to grow, they would have reached their expected weight.

To support its premise that the chickens would have reached their expected weight if given more time, National Union argues that the MJC reports and Phibro's notice of claim indicate this. We have found nothing, however, in the MJC reports that supports National Union's contention. Further, Phibro's notice of claim stated that chickens that consumed Aviax "appear to have (1) consumed substantially less feed than chickens not consuming Aviax, (2) had substantially lower feed conversion rates than chickens not consuming Aviax . . . and (3) consumed substantially lower quantities of drinking water than chickens not consuming Aviax."

> The result is that it has taken far longer to raise the chickens to slaughter size, with associated increased cost to the producer, and when ultimately slaughtered, because of the irregular growth of the chickens, the cost of processing the chickens has been increased. When Aviax has been removed from the feed rations, these impacts have reportedly been reversed.

These statements in the claim notice on their face are insufficient to establish conclusively that the chickens would have grown to their expected weight, if given more time. In fact, Dr. Cervantes stated in his affidavit that "[a]llowing the birds to grow longer than their normal slaughter date would not have solved the problem because as they grow older, their mortality rate rises and the lack of uniformity in size would

38

A-5589-13T3

have persisted."

Viewing the record, as we must, in the light most favorable to Phibro, there is a genuine question of fact as to whether removing the Aviax and allowing more time before slaughtering the chickens would have restored the chickens to use. Hence, summary judgment should not have been granted to National Union on the basis of the "impaired property" exclusion.

There also remains an open issue as to whether the phrase "restored to use" within the definition of impaired property means, on the one hand, restored to use, no matter what the cost, or, alternatively, conveys a qualified concept that considers commercial or economic feasibility.

Phibro argues that it was commercially infeasible to delay the slaughter of the chickens and they could not be restored by the pre-determined slaughter date. National Union conversely argues that the relevant inquiry is only "whether [the chickens] could have been restored," without considering the pre-determined slaughter date.

We conclude the most sensible reading of the phrase "restored to use" within the impaired property exclusion takes into account the cost and commercial feasibility of restoration. We decline to construe the phrase more expansively to encompass situations in which it would be exorbitant or commercially

unrealistic to attempt to return the damaged items to their former or normal condition. In this respect, we agree with an Indiana district court case involving a similar policy provision, finding it illogical to assume that parties to an insurance contract would intend such an exclusion to apply no matter what the cost of restoration might be. Am. Ins. Co. v. Crown Packaging, 813 F. Supp. 2d 1027, 1050 (N.D. Ind. 2011).

Here, in this factual setting, the more reasonable approach to assess whether the chickens could be restored to use is to evaluate whether the cost of delaying their slaughter until they achieved the expected weight was less than the damages incurred by adhering to the scheduled slaughter date. That assessment would presume, of course, that the chickens could ultimately achieve their normal expected weight. The pertinent facts on this subject along with the costs of delay and the damages incurred would need to be developed at a trial or plenary hearing.

We therefore conclude that the impaired property exclusion might apply here, but only if the chickens reasonably and feasibly could be restored to their normal size and weight within a commercially-viable time frame and at commercially reasonable cost. Because that assessment turns on material disputed facts, summary judgment on this issue was unwarranted.

The restoration issue therefore must be remanded for factual findings, after a trial or plenary hearing.

> **[At the direction of the court, the published version of this opinion omits Part III(B) and (C) concerning the inapplicability of the contractual liability and professional liability exclusions, and Part IV concerning the settlement of the customers' claims without the insurer's consent. R. 1:36-2(a).]**

## V.

The remaining arguments respectively raised by the parties lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5589-13T3