# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE BAND'S VISIT NATIONAL TOUR LLC; BANDSTAND TOUR LLC; BMGNET TOURING LLC; BRONX TOURING LLC; CATS ON TOUR LLC; CHOCOLATE TOURING LLC; ESCAPE ON TOUR LLC; HOSANNA TOUR LLC; LMS TOURING LLC; MY FAIR LADY ON TOUR; OOTI TOURING LLC; SAI TOURING LLC; SBSP TOURING LLC; TCP TOURING LLC; and WAITRESS TOURING LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. N22C-03-048 PRW CCLD |
| HARTFORD FIRE INSURANCE COMPANY, | ) ) ) ) | |
| Defendant. | ) | |

Submitted: October 15, 2023
Decided: November 29, 2023
Issued: December 11, 2023*

## OPINION AND ORDER

*Upon Defendant Hartford Fire Insurance Company's Motion for Summary Judgment,*
**GRANTED.**

David J. Baldwin, Esquire, Peter C. McGivney, Esquire, and Zachary J. Schnapp, Esquire, BERGER HARRIS LLP, Wilmington, Delaware; Peter A. Halprin, Esquire (*argued*), and Tae Andrews, Esquire, PASICH LLP, New York, New York; Kirk Pasich, Esquire, PASICH LLP, Los Angeles, California, *Attorneys for Plaintiffs The Band's Visit., et al.*

Tracy A. Burleigh, Esquire, and Sarah B. Cole, Esquire, MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, P.C., Wilmington, Delaware; Sarah D. Gordon, Esquire (*argued*), Elizabeth A. Cassady, Esquire, Johanna Dennehy, Esquire, Elise Haverman, Esquire, and Ansley Seay, Esquire, STEPTOE & JOHNSON LLP, Washington, D.C., *Attorneys for Defendant Hartford Fire Insurance Company.*

**WALLACE, J.**

When the COVID-19 pandemic first struck in March 2020, all types of businesses abruptly shuttered. When they tried to recoup just some portion of their mounting financial losses, many of those claims were denied by their insurance carriers. Since then, some have sued their insurers looking for coverage they believe is owed. This is one such lawsuit.

The Plaintiffs here are fifteen touring stage productions that were forced to suspend their performances in March 2020 and remain dormant for a substantial time thereafter. The Defendant is the insurance company from which those tours purchased coverage. The tours filed insurance claims for COVID-19-related losses that were denied, in whole or large part, by their insurer. So, the tours have brought here a suit with seven separate causes of action contesting those denials; their insurer now moves for full summary judgment thereon.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. THE PARTIES

Plaintiffs (collectively, "the Tours") are fifteen touring theater productions.[1] Fourteen of them (the "Non-Hosanna tours") purchased a one-year "all risk" insurance policy from Defendant Hartford Fire Insurance Company.[2] NETworks

---

*   This decision is issued after providing the parties an opportunity to request redaction of certain confidential information—none were made—and with the Court's own necessary corrections.

[1]   Complaint ("Compl.") ¶¶ 10-24 (D.I. 1).

[2]   Compl. ¶ 2.

Presentations LLC (the "NETworks tours" or "NETworks"), a company located in Maryland, manages nine of those theater productions.[3] Troika Entertainment (the "Troika tours" or "Troika"), a company also located in Maryland, manages four others.[4] Bandstand Tour LLC ("Bandstand") and Hosanna Tour LLC ("Hosanna") are the last two and are managed by Work Light Productions, a company located in New Jersey.[5]

Hartford is an insurance company incorporated in Connecticut.[6] All fifteen of the Tours obtained insurance from Hartford for a one-year period.[7] The NETworks tours procured their policies through an insurance broker, Maury Donnelly & Parr Inc. ("MDP"), and Robert Middleton, MDP's Director of the Arts Program.[8] Mr. Middleton's role as Director of the Arts Program at MDP was primarily to provide proposals from different insurance carriers to potential policyholders.[9] By 2020, MDP had been working with Hartford for close to two

---

[3]   *Id*. ¶ 7; Defendant Hartford's Opening Brief ("Hartford's Open. Br.") at 5, 5 n.1 (D.I. 106); The Tours' Answering Brief ("Tours' Ans. Br.") at 1, 1 n.1 (D.I. 111).

[4]   Hartford's Open. Br. at 5.

[5]   Compl. ¶¶ 11, 17; Hartford's Open. Br. at 5 n.3.

[6]   Compl. ¶ 25.

[7]   E.g., Hartford's Open. Br., Ex. 1 ("Standard Policy"); Hartford's Open. Br., Ex. 15 ("Hosanna Policy").

[8]   Hartford's Open. Br., Ex. 16 ("Middleton Dep.") 21, 61 (D.I. 107).

[9]   Middleton Dep. 21-22.

decades under The Hartford Agency Agreement (the "Agency Agreement").[10]

## B. MDP AND THE HARTFORD AGENCY AGREEMENT

On March 1, 2001, Hartford and MDP entered into the Agency Agreement.[11] The relevant provisions of that agreement are in the "Authority of Agent" and "Compensation" sections.[12]

In the "Authority of Agent" section, Hartford authorizes MDP "on [Hartford's] behalf" to "[s]olicit, quote and bind insurance in your territory for those lines of insurance and classes of business shown on the Declarations page," to "[d]eliver such policies as we may issue," to "[c]ollect, receive and receipt for premiums on such policies," and to "[p]rovide all usual and customary services of an insurance agent on all insurance policies you place with [Hartford]."[13]

The section also includes a limitations clause:

> You have the authority and power to act as our agent only to the extent expressly granted in this Agreement and no further authority or power is implied. You are an independent contractor and not an employee of ours for any purpose . . . . Any authority granted hereunder to solicit, quote or bind insurance products on our behalf is non-exclusive, unless we agree otherwise in writing.[14]

---

[10]  Tours' Ans. Br., Ex. 1 ("Agency Agreement") (D.I. 112).

[11]  *Id.*

[12]  *Id.* §§ II, V.

[13]  *Id.* §§ II.1(a)-(d).

[14]  *Id.* § II.2.

## C. THE TOURS' INSURANCE PROCUREMENT

The tale of this insurance dispute begins in spring 2018, when the NETworks tours began working with MDP and Mr. Middleton to procure insurance for their 2019-2020 travelling productions.[15] During the procurement, Mr. Middleton approached the NETworks tours with a new coverage form for performance disruption.[16] This new coverage form did not include the standard requirement for "direct physical loss or damage" to property in order for such disruption to be covered.[17] Mr. Middleton also informed Sheila Gladding, the Hartford underwriter responsible for the NETworks tours, of Networks' interest in this new form of coverage.[18]

That following winter, Mr. Middleton informed the NETworks tours that Hartford's plan was to add the "literally brand new" coverage form, once finished, "automatically on renewals and new shows," but only "by endorsement" on "existing" shows.[19] A couple months later, Mr. Middleton e-mailed Ms. Gladding:

> We are getting ready to embark on the insurance coverage for

---

[15] *See* Middleton Dep. 87-88; *see also* Tours' Ans. Br., Ex. 3 ("Email from NETworks to Middleton 08/13/18"). All the Tours were insured by Hartford for the 2019-2020 touring season, but only NETworks tours' story dates back to 2018.

[16] *See* Tours' Ans. Br., Ex. 10 ("Email from Middleton to NETworks Undated").

[17] *See* Tours' Ans. Br., Ex. 5 ("Emails between Middleton and Gladding May 2018"); Tours' Ans. Br., Ex. 6 ("Email from Middleton to Gladding 08/15/18").

[18] Email from Middleton to Gladding 08/15/18 ("Networks . . . is very interested in this enhanced coverage.").

[19] Tours' Ans. Br., Ex 11 ("Email from Middleton to NETworks 01/14/19").

new shows and the renewal of existing ones. I need to know if Hartford is going to be able to address this coverage in 2019. If not, we are prepared to work with other carriers in pursuit of this coverage feature.[20]

Ms. Gladding informed Mr. Middleton on May 21, 2019, that Hartford was working on finalizing the new coverage form, but that it would not be ready until "3rd quarter 2019."[21]

With the foregoing information in tow, the NETworks tours purchased coverage from Hartford for their 2019-2020 touring productions.[22] The nine shows were all bound for a one-year period, with policies commencing between late June and late October.[23] The signed policies did not include the yet-to-be-finalized new coverage form.[24]

Next, the NETworks tours, Mr. Middleton, and Hartford embarked on an extended back-and-forth regarding a finalized version of the new coverage form. On September 30, 2019, Ms. Gladding informed Mr. Middleton that Hartford would "have [a] draft form . . . for your review within the next 2 weeks."[25] Mr. Middleton

---

[20]  Tours' Ans. Br., Ex. 12 ("Email from Middleton to Gladding 03/1/19").

[21]  Tours' Ans. Br., Ex. 15 ("Email from Gladding to Middleton 05/21/19").

[22]  *See, e.g.,* Standard Policy; *see also* Hartford's Open. Br. at 11.

[23]  E.g., Standard Policy. Although each individual tour purchased a separate policy, all Non-Hosanna tour policies are identical in all relevant parts. Thus, any reference to the Standard Policy purchased by the Non-Hosanna tours will cite to the policy at Hartford's Open. Br., Ex. 1, and be discussed and interpreted as one single policy.

[24]  *Id.*

[25]  Tours' Ans. Br., Ex. 19 ("Email from Gladding to Middleton 09/30/19").

then told the NETworks tours that the new coverage form was "approved by Hartford" and that MDP would have the finalized version "within two weeks" along with "the ability to provide coverage."[26]  On October 8, 2019, Ms. Gladding informed Mr. Middleton that Hartford would "be able to amend an existing account via endorsement."[27]  Mr. Middleton relayed to NETworks that the new coverage form "will be available 11/1.  We will have the actual form by the end of next week."[28]

On December 17, 2019, Ms. Gladding sent the finalized version of the new coverage form to Mr. Middleton.[29]  Soon thereafter, Mr. Middleton forwarded the finalized version to NETworks, along with the message:

> I am very excited about this proposal for Chicago Touring LLC,[30] as it incorporates our first policy with the enhanced Business Income coverage.  To reiterate, this drops the requirement for property damage to trigger the coverage, just that you are unable to put on a performance due to something beyond your control.[31]

---

[26]  Tours' Ans. Br., Ex. 23 ("Email from Middleton to NETworks 10/01/19") ("Finally, after two years, we have the broader business income policy approved by Hartford. This removes the requirement for Physical damage to be present for a claim to be paid. This would mean that a covered occurrence would be an event beyond an insured's control, such as trucks stuck in the snow, or the Civil Authority cancelling performances . . . . We will have the form within two weeks and the ability to apply coverage.").

[27]  Tours' Ans. Br., Ex. 24 ("Email from Gladding to Middleton 10/08/19").

[28]  Tours' Ans. Br., Ex. 25 ("Email from Middleton to NETworks 10/8/19").

[29]  *See* Hartford Open. Br., Ex. 28 ("Email from Gladding to Middleton 12/17/19").

[30]  The template version of the Theatrical Extension that was sent to Middleton used Chicago Touring LLC, a non-NETworks tours production, as a placeholder. *See* Tours' Ans. Br., Ex. 36 ("Emails between Middleton and NETworks December 2019"); Hartford Open. Br. at 12.

[31]  Emails between Middleton and NETworks December 2019.

The NETworks tours responded, "[t]hanks Bob! How do we get that provision added to our other current tours? Or has it already been added?"[32] Mr. Middleton replied, "[w]e are in the process of doing that. Should take a week."[33] Mr. Middleton, however, had not yet consulted Hartford.[34] Mr. Middleton then informed Ms. Gladding that the NETworks tours wanted to add the new coverage form to in-force shows.[35] Inexplicably, communications between all parties about this potential change to the NETworks tours' extant coverage then ceased until 2020.[36]

## D. THE PANDEMIC STRIKES.

In early March 2020, the COVID-19 pandemic was unfolding and the parties' talks about the additional coverage resumed in earnest.[37] On March 2, 2020, Mr. Middleton told NETworks that he "would be contacting Hartford right away to get [the new coverage form] in place immediately."[38] Two days later, Mr. Middleton informed Ms. Gladding that NETworks wanted to "move coverage . . . to the new

---

[32] *Id.*

[33] Hartford's Open. Br., Ex. 30 ("Email from Middleton to NETworks 12/19/19").

[34] *See id.*; Tours' Ans. Br., Ex. 37 ("Email from Middleton to Gladding 12/19/19").

[35] Email from Middleton to Gladding 12/19/19. "In-force" means shows that have already started touring and are already insured.

[36] *See* Hartford's Open. Br., Ex. 34 ("Emails between Middleton and Gladding March 2020"); Hartford's Open. Br. at 15.

[37] Emails between Middleton and Gladding March 2020.

[38] Hartford's Open. Br., Ex. 18 ("NETworks Exec. Dep.") 127.

form this quarter."[39]  Ms. Gladding responded, "I will facilitate that for you.  Please go ahead and send me any information you have, and I will get started on this."[40]

On March 6, MDP emailed Ms. Gladding requesting a quoted price for adding the new coverage form to each of the NETworks tours' policies, effective March 15, 2020.[41]  Soon thereafter, NETworks reached out to Mr. Middleton for clarification as to whether the requested policy changes would be effective on March 15, 2020.[42]  Middleton responded, without consulting with or hearing back from Hartford, "[y]es, by 3/15."[43]

On March 12, 2020, Ms. Gladding rejected Mr. Middleton's requests: "With the continued uncertainty surrounding the impacts and effects related to the coronavirus, we have been asked to hold off on broadening coverage by adding the [new coverage form]."[44]  On March 20, Ms. Gladding confirmed to MDP that, "[f]or in-force business, The Hartford does not intend to extend coverage for any potential Coronavirus exposure" by adding the new coverage form.[45]

---

[39]  Emails between Middleton and Gladding March 2020.

[40]  *Id*.

[41]  Hartford's Open. Br., Ex. 35 ("Emails from MDP to Gladding 03/06/20").

[42]  Hartford's Open. Br., Ex. 36 ("Emails between Middleton and NETworks March 2020").

[43]  Emails between Middleton and NETworks March 2020.

[44]  Hartford's Open. Br., Ex. 40 ("Email from Gladding to Middleton 03/12/20").

[45]  Hartford's Open. Br., Ex. 47 ("Email from Gladding to Middleton 03/20/20").

## E. THE DIFFERENT POLICIES

There are two insurance policy types relevant to this summary judgment motion: The Non-Hosanna tours' Commercial Inland Marine Business Insurance Policy (the "Standard Policy"), and Hosanna's policy with the new Theatrical Property Policy Extension (the "Theatrical Extension") coverage form.[46]

In March 2020, the Non-Hosanna tours were insured under the Standard Policy.[47] The pertinent sections of the Standard Policy are the "Loss of Use" and the "Dependent Property" coverage forms, as well as definitions from the "Entertainment Equipment Choice" coverage form and accompanying Schedule.

The "Loss of Use" coverage form states that Hartford "will pay for the actual loss of Business Income you sustain during the 'period of restoration' due to the necessary 'suspension' of your operations. The 'suspension' must be caused by direct physical loss to 'Covered Property' . . . by a Covered Cause of Loss . . ."[48]

The relevant sections of the "Dependent Property" coverage form are the "Coverage" and "Civil Authority" sections.[49] Per the "Coverage" section, Hartford "will pay up to the Limit of Insurance described in the SCHEDULE for the actual loss of Business Income you sustain . . . due to direct physical loss to Dependent

---

[46] Standard Policy; Hosanna Policy.

[47] Standard Policy.

[48] *Id*. (Loss of Use Coverage) § A.1.

[49] *Id*. (Dependent Property Coverage) §§ A.1, A.2.

Property caused by or resulting from a Covered Cause of Loss."[50] The "Civil Authority" section provides that Hartford "will pay for the actual loss of Business Income you sustain caused by an action of a civil authority that prohibits access to a Dependent property, due to a direct physical loss or damage to property in the immediate area of the Dependent Property, caused by or resulting from a Covered Cause of Loss."[51]

"Dependent Property" is defined in the Standard Policy as "theaters, concert halls, opera houses and other locations owned and operated by others at which you perform your shows and productions."[52] "Covered Cause of Loss" is defined as "direct physical 'loss' to Covered Property from an external cause that occurs by chance," and "loss" is defined as "accidental loss or damage."[53]

The Standard Policy also includes a "Changes" provision: "This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy."[54]

Hosanna's policy differs from the rest of the Tours', as it includes the

---

[50] *Id.* § A.1.

[51] *Id.* § A.2.

[52] *Id.* § A.1.c.

[53] *Id.* (Entertainment Equipment Coverage) §§ A.3, F.1.

[54] *Id.* (Common Policy Provisions) § B.

Theatrical Extension with no "direct physical loss or damage" requirement.[55] Hosanna's Theatrical Extension coverage was agreed upon in February 2020 and effected in March 2020.[56] The Theatrical Extension provides coverage for "the actual loss of Business Income you sustain due to the necessary, interruption, postponement or cancellation of a production due to a 'covered occurrence'."[57] A "covered occurrence" is defined as "any unexpected circumstances beyond your control except as listed in the Exclusions."[58] Hosanna's policy provides a $1.4 million Business Income coverage limit "per occurrence."[59]

## F. HARTFORD REFUSES THE NON-HOSANNA TOURS' COVID-19 CLAIMS AND PAYS HOSANNA UNDER THE THEATRICAL EXTENSION.

All of the Tours suspended their travelling productions in March 2020 due to the COVID-19 pandemic.[60] Each Non-Hosanna tour each submitted a claim to Hartford for coverage under its Standard Policy.[61] Hartford's claim handlers solicited information from the Non-Hosanna tours about their losses through a

---

[55] Hosanna Policy.

[56] Hartford's Open. Br., Ex. 32 ("Email from Gladding to Middleton 02/05/20").

[57] Hosanna Policy (Theatrical Extension) § B.1.a.

[58] *Id*. § B.9.a.

[59] *Id*. § Schedule.

[60] *See* NETworks Exec. Dep. 191: *see also* Hartford's Open. Br., Ex. 19 ("Troika Exec. Dep."); Hartford's Open. Br., Ex. 20 ("Hosanna Exec. Dep."); Hartford's Open. Br., Ex. 53 ("Band's Visit Claim"); Hartford's Open. Br., Ex. 54 ("Escape on Tour Claim"); Hartford's Reply Brief in Support of its Motion for Summary Judgment ("Hartford's Repl. Br.") at 12 (D.I. 125); Tours' Ans. Br. at 21.

[61] E.g., Band's Visit Claim.

questionnaire, held follow-up calls with Mr. Middleton or the Non-Hosanna tours' employees, and ultimately denied each of the Non-Hosanna tours' claims.[62]

Hosanna, like the Non-Hosanna tours, also had to suspend its tour in March 2020 due to the COVID-19 pandemic and the resulting government-imposed shutdown orders.[63] Hosanna submitted a claim for lost business income to Hartford under its Theatrical Extension coverage.[64] In response, Hartford determined that Hosanna's losses arose because of cancelled performances due to a "covered occurrence."[65] Hartford solicited information from Hosanna about its losses through a questionnaire, held follow-up calls, and paid Hosanna $1.4 million on July 22, 2020, for Lost Business Income and Extra Expense.[66] Two months later, Hosanna submitted a second claim, contending that each cancelled engagement arose from a separate occurrence.[67] Hartford followed the same procedure as before and denied that second claim in November 2020.[68]

---

[62] *E.g., id.*; Escape on Tour Claim; *see also* Hartford Repl. Br. at 11-12.

[63] Hartford's Open. Br., Ex. 55 ("Hosanna Claim").

[64] Hosanna Policy.

[65] Hosanna Claim.

[66] Hartford's Open. Br., Ex. 56 ("Hosanna Claim Payment").

[67] Hartford's Open. Br., Ex. 51 ("Email from Middleton to Hosanna"); Hartford's Open. Br., Ex. 57 ("Hosanna Second Claim").

[68] Hartford's Open. Br., Ex. 52 ("Hosanna Second Claim Denial").

## G. THE TOURS BRING SUIT SEEKING COVERAGE.

On March 4, 2022, the Tours initiated this action against Hartford.[69] The Tours have asserted seven causes of action:

> Breach of contract for the denial of the Non-Hosanna tours' claims (Count I);[70] Breach of the duty of implied faith and fair dealing for the denial of the Non-Hosanna tours' claims (Count II);[71] Declaratory relief confirming the Tours' contentions in Counts I and II (Count III);[72] Fraud by Hartford regarding the addition of the Theatrical Extension (Count IV);[73] Declaratory relief regarding the addition of the Theatrical Extension to NETworks tours' existing policies (Count V);[74] Breach of contract for the denial of Hosanna's second claim (Count VI),[75] and; Breach of the implied duty of good faith and fair dealing for the denial of Hosanna's second claim (Count VII).[76]

Hartford answered and discovery ensued.[77] Hartford now moves for summary judgment on all the Tours' causes of action.[78]

---

[69]  *See* Compl.

[70]  *Id.* ¶¶ 151-159.

[71]  *Id.* ¶¶ 160-170.

[72]  *Id.* ¶¶ 171-178.

[73]  *Id.* ¶¶ 179-198.

[74]  *Id.* ¶¶ 199-205.

[75]  *Id.* ¶¶ 206-209.

[76]  *Id.* ¶¶ 210-220.

[77]  Hartford's Answer (D.I. 9); *see* Hartford's Open. Br. at 22.

[78]  *See generally* Hartford's Open. Br.

## II.  PARTIES' CONTENTIONS

Hartford insists that it is entitled to summary judgment on all seven counts of the Tours' complaint.[79]  As a threshold matter, Hartford contends that Maryland law should apply to all claims by NETworks and Troika because of their contacts with Maryland, and that New Jersey law should apply to Bandstand and Hosanna's claims due to their New Jersey contacts.[80]

### A. NON-HOSANNA TOURS' CLAIMS OF BREACH OF CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Hartford first moves for summary judgment on the breach-of-contract claims found in Counts I and III.[81]  At bottom, Hartford argues that the Non-Hosanna tours are not entitled to coverage under the Standard Policy for their losses due to the COVID-19 pandemic and its effects.[82]

Hartford relies heavily on the recent decision of the Supreme Court of Maryland's in *Tapestry, Inc. v. Factory Mutual Ins. Co.*, contending that under Maryland law the language "direct physical loss" in an insurance policy means there must be "tangible, concrete, and material harm" to trigger coverage.[83]   When applying New Jersey law, Hartford cites to multiple New Jersey cases that have

---

[79]  *See id.*

[80]  *Id.* at 24-33.

[81]  *Id.* at 33-39.

[82]  *Id.*

[83]  243 A.3d 1044, 1056 (Md. 2022); Hartford's Open. Br. at 33-36.

interpreted "direct physical loss" as requiring "demonstrable damage" to the physical structure of subject property.[84]

Hartford further contends that any impact of COVID-19 cannot constitute "direct physical loss" as it is used in the policies because "direct physical loss" requires actual physical damage under either Maryland or New Jersey law.[85] Hartford also notes that none of the Non-Hosanna tours provided evidence that any tours were suspended due to the actual presence of the virus, arguing instead that the suspensions were in response to the pandemic as a whole.[86] Even if it were proven that COVID-19 was present at any of the venues, Hartford maintains that the presence of virus on surfaces and in the air does not involve the requisite physicality that Maryland or New Jersey courts have required.[87] As such, Hartford contends that the Non-Hosanna tours' claims for cancellation coverage under the Standard Policy—and the correlated claims for declaratory relief—can now be conclusively rejected.[88]

The Non-Hosanna tours oppose Hartford's motion on Counts I and III.[89] Both

---

[84] *Id*. at 36-39.

[85] *Id*.

[86] *Id*. at 35.

[87] *Id*. at 35-36, 38-39.

[88] *Id*. at 36, 38-39.

[89] Tours' Ans. Br. at 54-58.

the Maryland- and New Jersey-based Non-Hosanna tours contend that there remains a genuine issue for trial as to whether COVID-19 itself counts as "direct physical loss or damage" under either state's laws.[90] Specifically, these tours argue that "[a] direct physical loss often involves some physical alteration to the covered property," and that "several courts have ruled that alterations at the 'microscopic' or 'molecular' level may constitute physical loss under a property insurance policy."[91] Further, the Non-Hosanna tours maintain that discovery has revealed scientific evidence that COVID-19 is a "physical substance," pointing to expert depositions and planned testimony about how the virus spreads through "fomite transmission" and via airspaces.[92] The Maryland- and New Jersey-based tours also argue that there is a substantial statistical likelihood that COVID-19 was present at the venues where the Tours would perform, but primarily attribute their income losses to the general presence of the virus in the atmosphere and in the world.[93]

Hartford contends that, as to Count II, it is entitled to summary judgment on the Non-Hosanna tours' claims of breach of the implied covenant of good faith and fair dealing.[94] Hartford says there can be no bad faith in the absence of coverage in

[90]  *Id.* at 58-62.

[91]  *Id.* at 54-55.

[92]  *Id.* at 58-59.

[93]  *Id.* at 61-62.

[94]  Hartford's Open. Br. at 43-45.

the first instance; too, it points to the routine and ordinary manner in which the claims were handled and ultimately denied.[95]

The Non-Hosanna tours counter that Hartford acted in bad faith when it denied their claims under the Standard Policy, so summary judgment cannot be rendered on Count II.[96] In the Non-Hosanna tours' view, Hartford failed to properly investigate the claims and instead issued "boilerplate denials" when coverage of their COVID-19-related claims was indeed due.[97]

## B. HOSANNA'S BREACH-OF-CONTRACT AND GOOD FAITH CLAIMS

Hartford contends that it is entitled to summary judgment on Hosanna's breach-of-contract claim (Count VI).[98] In short, Hartford maintains that the only reasonable interpretation of Hosanna's Theatrical Extension is that the tour cancellation due to COVID-19 constituted one singular "covered occurrence."[99] Additionally, Hartford argues that Hosanna's shutdown was due to the pandemic as a whole, not the individual closure orders that occasioned it.[100] Hosanna opposes Hartford's motion, arguing that each cancelled engagement was a separate

---

[95] *Id.*; Hartford's Repl. Br. at 12-13.

[96] Tours' Ans. Br. at 62-66.

[97] *Id.* at 2, 65.

[98] Hartford's Open. Br. at 39-43.

[99] *Id.*

[100] *Id.*

"occurrence" under the policy.[101]  Hosanna relies on *Jujamcyn Theaters LLC v. Fed. Ins. Co.*—where a federal district court in New York found a nearly identical policy to be ambiguous—to  posit that "covered occurrence" is subject to more than one reasonable interpretation.[102]

Relatedly, Hartford contends it is also entitled to summary judgment on Hosanna's bad faith claim (Count VII).  Hartford argues that its denial of Hosanna's second claim was proper, ordinary, and reasonable.[103]  In opposition, Hosanna protests that Hosanna acted unreasonably.[104]

### C. NETWORKS TOURS' FRAUD CLAIM

Hartford further moves for summary judgment on the NETworks tours' fraud claim found in Count IV.[105]  Here, Hartford makes three main arguments:  (1) No one at Hartford made any false statements directed to the NETworks tours regarding the addition of the Theatrical Extension; (2) Hartford cannot be held vicariously liable for Mr. Middleton's statements, and; (3) even if Hartford could be vicariously liable for Mr. Middleton's statements, there is no basis for liability because

---

[101]  Tours' Ans. Br. at 66-67.

[102]  2023 WL 2366789, at *6-7 (S.D.N.Y. Mar. 6, 2023); *id*. at 51-52.

[103]  Hartford's Open. Br. at 43-45.

[104]  Tours' Ans. Br. at 66-68.

[105]  Hartford's Open. Br. at 61-66.

Mr. Middleton did not perpetuate an actionable fraud.[106]

In opposing Hartford's attack on its fraud claim, the NETworks tours suggest first that a genuine issue of material fact remains whether a principal-agent relationship existed between Hartford and MDP, as evidenced by the written Agency Agreement.[107] Second, the NETworks tours argue that there is sufficient evidence of Mr. Middleton's fraudulent misrepresentations to present to a jury, contending that Mr. Middleton made false statements about the addition of the Theatrical Extension to the Standard Policy.[108] The NETworks tours maintain that Hartford is vicariously liable for MDP and Mr. Middleton's purported fraudulent misrepresentations regarding the Theatrical Extension.[109]

## D. DECLARATORY JUDGMENT CLAIM REGARDING MODIFICATION OF THE STANDARD POLICY

Finally, Hartford says it is entitled to summary judgment on the Tours' prayer for declaratory judgment demanding the addition of the Theatrical Extension to the Standard Policy (Count V).[110] Hartford identifies the policy's endorsement requirement as forestalling any finding that the Standard Policy was or could be

---

[106] *Id.* at 61.

[107] Tours' Ans. Br. at 24-40.

[108] *Id.* at 31-40.

[109] *Id.* at 24-40.

[110] Hartford's Open. Br. at 45-60.

deemed modified to include the Theatrical Extension.[111]  Put simply, because such an endorsement was never issued, the Standard Policy cannot be deemed modified.[112]  And, adds Hartford, even if Mr. Middleton had the authority to bind Hartford and issue such an endorsement, he never did so.[113]

## III.  APPLICABLE LEGAL STANDARDS

"Summary judgment is appropriate where the record demonstrates that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"[114]  The standards the Court employs to determine whether summary judgment is due are well-known.  The Court: "(i) construes the record in the light most favorable to the non-moving party; (ii) detects, but does not decide, genuine issues of material fact; and (iii) denies the motion if a material fact is in dispute."[115]  A fact is material if it "might affect the outcome of the suit under governing law."[116]

---

[111]  *Id*. at 45-50.

[112]  *Id.*

[113]  *Id*. at 50-61.

[114]  *Parexel Int'l (IRL) Ltd. v. Xynomic Pharms., Inc.*, 2020 WL 5202083, at *4 (Del. Super. Ct. Sept. 1, 2020) (quoting Del. Super. Ct. Civ. R. 56(c)).

[115]  *US Dominion, Inc. v. Fox News Network, LLC,* 2023 WL 2730567, at *17 (Del. Super. Ct. Mar. 31, 2023 (quoting *CVR Ref., LP v. XL Specialty Ins. Co.*, 2021 WL 5492671, at *8 (Del. Super. Ct. Nov. 23, 2021)) (cleaned up).

[116]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").  *See also In re Asbestos Litigation*, 2006 WL 3492370, at *3 (Del. Super.

-20-

During summary judgment proceedings, the movant bears the initial burden of demonstrating that the undisputed facts support that party's claims or defenses.[117] Only if the motion is properly supported, does the burden then shift to the opponent to demonstrate that there are material issues of fact for the resolution by the ultimate fact-finder.[118] Of course, the "issue of fact must be genuine."[119] And one opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to material facts."[120]

To be sure, the Court must—in the same instant—be both willing and cautious during its summary judgment examination.[121] But in the end, if it "finds that no genuine issues of material fact exist, and the moving party has demonstrated [its] entitlement to judgment as a matter of law, then summary judgment is appropriate."[122]

---

Ct. Nov. 28, 2006); *Farmers Bank of Willards v. Becker*, 2011 WL 3925428, at *3 (Del. Super. Ct. Aug. 19, 2011).

[117] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979) (citing *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962)).

[118] *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).

[119] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (cleaned up).

[120] *Id.*

[121] *See McCabe v. Wilson,* 1986 WL 8008, at *2 (Del. Super. Ct. June 26, 1986) (observing first that it is "true that although difficult questions of law may exist, that in and of itself is not a ground for denying summary judgment inasmuch as refusing to grant the motion does not obviate the Court's obligation to make a difficult decision" but then cautioning that "summary judgment, with ever-lurking issues of fact, is a treacherous shortcut").[121]

[122] *Brooke v. Elihu-Evans*, 1996 WL 659491, at *2 (Del. Aug. 23, 1996) (citing *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322 (Del. Super. Ct. 1973)); *see also Jeffries v. Kent*

-21-

# IV.  DISCUSSION

## A. HARTFORD IS ENTITLED TO SUMMARY JUDGMENT ON NETWORKS AND TROIKA'S BREACH-OF-CONTRACT AND GOOD FAITH CLAIMS.

### 1.  Maryland law applies to NETworks and Troika's claims.

As the forum state, Delaware applies its own choice-of-law rules.[123]  Courts in Delaware follow the Second Restatement's "most significant relationship" analysis when considering choice of law in contract disputes.[124]

There are three potential steps to be taken in Delaware's "most significant relationship" analysis:

> (i) determining if the parties made an effective choice of law through their contract; (ii) if not, determining if there is an actual conflict between the laws of the different states each party urges should apply; and (iii) if so, analyzing which state has the most significant relationship.[125]

These Hartford policies do not specify which state's law applies to disputes arising thereunder.[126]  So, the Court must determine whether there is an actual

---

*Cnty. Vocational Tech. Sch. Dist. Bd. of Educ.*, 743 A.2d 675, 677 (Del. Super. Ct. 1999) ("However, a matter should be disposed of by summary judgment whenever an issue of law is involved and a trial is unnecessary." (citing *Mitchell v. Wolcott*, 83 A.2d 759, 761 (Del. 1951)).

[123] *See Sinnott v. Thompson*, 32 A.3d 351, 354 (Del. 2011).  More broadly, all questions of procedure in this dispute will be addressed under Delaware law. *See Weinstein v. Luxeyard, Inc.*, 2022 WL 130973, at *3 (Del. Super. Ct. Jan. 14, 2022) (". . . the general principle that the procedural law of the forum state governs . . .").

[124] *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017).

[125] *Id.*

[126] *See* Standard Policy.

conflict between the jurisdiction's laws each party urges should apply.[127]  If the parties urge the application of the same state laws though, further inquiry on any potential conflict becomes unnecessary; the choice of law may be deemed established by "implied consent."[128]

Hartford urges that Maryland law applies to NETworks and Troika tours' claims.[129]  NETworks and Troika agree.[130]  This is sufficient to establish that Maryland law governs all claims by the NETworks and Troika tours.[131]

**2. Under Maryland law, "direct physical loss" unambiguously means tangible, concrete, and material harm.**

The interpretation of an insurance policy is a question of law for the court.[132] Maryland follows the "objective theory of contract interpretation."[133]  If language in an insurance policy is ambiguous when interpreted according to the objective theory of contract interpretation, Maryland courts "construe that language 'liberally in favor

---

[127] *Certain Underwriters at Lloyds, London*, 160 A.3d at 464.

[128] *See Golden Pacific Bancorp v. F.D.I.C.*, 273 F.3d 509, 514, 514 n.4 (2d Cir. 2001) (finding that choice of law was established by implied consent through the briefs of both parties, since both parties assumed New York substantive law governed the issues) (citation omitted).

[129] Hartford's Open. Br. at 24-32.

[130] Tours' Ans. Br. at 24.

[131] *See Golden Pacific Bancorp*, 273 F.3d at 514 n.4.

[132] *See Clancy v. King*, 954 A.2d 1092, 1101 (Md. 2008) (describing the interpretation of a contract as a question of law).

[133] *Plank v. Cherneski*, 231 A.3d 436, 476 (Md. 2020) (citations omitted).

of the insured and against the insurer as drafter of the instrument.'"[134]  A contract "is ambiguous if, 'when viewed from [a] reasonable person perspective, that language is susceptible to more than one meaning.'"[135]  When interpreting insurance policies in particular, Maryland courts "examine the instrument as a whole, focusing on the character, purpose, and circumstances surrounding the execution of the contract."[136]

The Supreme Court of Maryland in *Tapestry, Inc. v. Factory Mutual Ins. Co.* interpreted the phrase "physical loss or damage" in an insurance policy as requiring "tangible, concrete, and material harm."[137]  In *Tapestry*, the plaintiff retailer operated 15 stores in Maryland and over 1,400 worldwide.[138]  That retailer was insured by the defendant company under two policies[139] covering "property . . . against all risks of physical loss or damage, except as hereinafter excluded."[140]  The Maryland high

---

[134]  *Connors v. Gov't Emps. Ins. Co.*, 113 A.3d 595, 605 (Md. 2015) (quoting *Megonnell v. United Servs. Auto. Ass'n*, 796 A.2d 758, 772 (Md. 2002)).

[135]  *Ocean Petroleum, Co., Inc. v. Yanek*, 5 A.3d 683, 690-91 (Md. 2010) (citing *United Servs. Auto. Assoc. v. Riley*, 899 A.2d 819, 833 (Md. 2006)).

[136]  *Bailer v. Erie Ins. Exchange*, 687 A.2d 1375, 1378 (Md. 1997); *see also Plank*, 231 A.3d at 476-77 ("in interpreting a contract provision, we look to the entire language of the agreement, not merely a portion thereof." (quoting *Nova Rsch., Inc. v. Penske Truck Leasing Co.*, 952 A.2d 275, 283 (Md. 2008))).

[137]  286 A.3d 1044, 1055 (Md. 2022).

[138]  *Id.* at 1049.

[139]  The two policies in *Tapestry* provide "property damage" coverage and "time element" coverage.  Business interruption or business income loss coverage is sometimes referred to as time element coverage, as it is here.  Only the time element coverage analysis is relevant for this analysis.  Time element or business income loss coverage protects against the consequence of the loss, not the damage to the property itself. *See id.*

[140]  *Id.*

court determined that the phrase "physical loss or damage" is not ambiguous, and thus its interpretation was grounded on the phrase's ordinary meaning.[141] The *Tapestry* court then gleaned from dictionary definitions that "**physical loss or damage**" must involve "**tangible**, **concrete, and material harm** to the property or a deprivation of possession of the property."[142]

Here, the Standard Policy includes two coverage provisions of note: Loss of Use Coverage and Dependent Property Coverage. Loss of Use Coverage includes "the actual loss of Business Income you sustain during the 'period of restoration' due to the necessary 'suspension' of your operations . . . caused by direct physical loss to 'Covered Property' . . . by a Covered Cause of Loss . . ."[143] Dependent Property Coverage includes payment "for the actual loss of Business Income you sustain . . . due to direct physical loss to Dependent Property caused by or resulting from a Covered Cause of Loss."[144] "Covered Cause of Loss" is defined as "direct physical 'loss' to Covered Property from an external cause that occurs by chance," and "loss" is defined as "accidental loss or damage."[145] When incorporating internal definitions, "direct physical loss" equates to "direct physical loss or damage."

---

[141] *Id.* at 1054-56.

[142] *Id.* at 1056 (emphasis added) (citations omitted).

[143] Standard Policy (Loss of Use Coverage) § A.1.

[144] *Id.* (Dependent Property Coverage) § A.1.

[145] *Id.* (Entertainment Equipment Coverage) §§ A.3, F.1.

The Standard Policy's phrase "direct physical loss" is unambiguous: The property in question must be lost or damaged. There is a physicality component, and such physicality must be directed toward the property. Moreover, the property loss or damage must be that which "caused" the insured's loss of business income due to necessary suspension or interruption of operations. Even when construing the terms liberally and in favor of the insured, the Court finds no reason to stray from the ordinary meaning of the at-issue coverage terms just as *Tapestry* set out.

The NETworks and Troika tours insist the Court should give weight to Hartford's omission of a "virus exclusion" from the Standard Policy—despite Hartford's prior knowledge of the dangers of viruses.[146] The same was said in *Tapestry*,[147] and the same consideration thereof abides. As the *Tapestry* court noted, "[u]ltimately, we are interpreting the [p]olicies . . . issued. We do not think the availability on the insurance market of a broader virus exclusion undermines the unambiguous language employed in the [p]olicies."[148] Just so here.

Accordingly, "direct physical loss" as it is used in the Business Income Coverage, Dependent Property, and Civil Authority provisions of the Standard Policy is interpreted to require "tangible, concrete, and material harm" to property

---

[146] Compl. ¶ 142; Tours' Ans. Br. at 2, 54, 66.

[147] *Tapestry*, 286 A.3d at 1058-59.

[148] *Id.*

be the cause of business income loss under Maryland law.

### 3. COVID-19 did not cause tangible, concrete, and material harm to the NETworks and Troika tours' (or dependent) property.

As established, "direct physical loss" requires "tangible, concrete, and material harm" to property under Maryland law.[149] When applying this definition, the *Tapestry* court held that "tangible, concrete, and material harm to property . . . unambiguously requires a *loss of property*, not the loss of *use* of property."[150] The court elaborated, "[a]lthough the complete destruction or ruin of property can, indeed, constitute a loss of that property, by permanently depriving the owner of any value in it, the temporary loss of functional use of the same thing is different."[151]

COVID-19 did not cause tangible, concrete, and material harm to the NETworks and Troika tours' property (or dependent property). First, the general presence of COVID-19 and the ensuing global pandemic did (and still does) not constitute direct physical loss as meant in the Standard Policy. Such "presence" is too attenuated to qualify as tangible or concrete, and too abstract to be found material.

Second, government closure orders because of that presence fall under the category of mere loss of functionality or use. Just as the loss of functionality did not

---

[149] *Id.* at 1056 (citations omitted).

[150] *Id.* (quoting *Terry Black's Barbecue v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 456 (5th Cir. 2022)) (emphasis in original).

[151] *Id.*

constitute "physical loss or damage" in *Tapestry*,[152] neither the suspension of the touring theater productions nor the cancellation of engagements by venues constitute "direct physical loss" envisaged upon a reasonable read of the Standard Policy.

Third, even if COVID-19 *was* present at the venues, the evidence presented does not support a claim that the Maryland-based tours' property was so damaged as to be the actual necessary cause of business interruption. If COVID-19 does in any way physically damage the air, these tours haven't explained how that physical "damage" effected the Covered Property in the Standard Policy in the manner anticipated to trigger the specific defined coverage. If COVID-19 does physically alter surfaces during contamination, these tours have shown neither the permanence of said alteration nor the physical alteration of the structures themselves. Thus, these contentions are insufficient to establish a genuine issue for trial under Maryland law.

Contrary to the NETworks and Troika's contentions,[153] the Supreme Court of Maryland reviewed extensive scientific evidence explaining how SARS-CoV-2, the virus that causes COVID-19, physically alters both the air and surfaces it touches. Specifically, the court in *Tapestry* responded to nearly identical arguments regarding the physicality of COVID-19, including that: those coronavirus particles "altered" objects like doorknobs and purses into "vectors or disease"; when such coronavirus-

---

[152]  *Id*. at 1059-61.

[153]  *See supra* Part II(A).

infected particles settle on a surface, that surface becomes a 'fomite' and may remain infectious for days, and; coronavirus particles enter the air in droplet or aerosol form and physically alter the composition of the air.[154] Even when assuming the truth of these facts, the *Tapestry* court found that "the combination of a virus's proximity to property and resulting risk to human health does not constitute 'physical loss or damage' to the property."[155] So too here.

Furthermore, expert testimony of a substantial statistical likelihood that COVID-19 was present at the venues where the Tours would perform[156] is inconsequential. Such testimony neither establishes that COVID-19 was in fact present at the venues, nor renders its effects tangible, concrete, or material.

Put simply, there is a claim-dooming disconnect between any theoretical change to physical structures of and within the theatres and the actual reason that these productions were shut down.

When viewing the facts in the light most favorable to NETworks and Troika, the evidence presented creates no genuine issue of material fact as to whether COVID-19 caused "direct physical loss" under Maryland law. Accordingly, summary judgment on the NETworks and Troika tours' claim in Count I and

---

[154] *Tapestry*, 286 A.3d at 1059-61.

[155] *Id.* at 1061.

[156] Tours' Ans. Br., Ex. 53 ("Expert Wit. Dep.")

associated declaratory relief in Count III is **GRANTED**.

### 4. Hartford did not act in bad faith toward NETworks and Troika.

NETworks and Troika also allege that Hartford breached the implied covenant of good faith and fair dealing.[157] No independent cause of action at law exists in Maryland for breach of the implied covenant of good faith and fair dealing.[158] "A breach of the implied duty of good faith and fair dealing is better viewed as an element of another cause of action at law, e.g., breach of contract, than as a stand-alone cause of action for money damages[.]"[159] Bad faith "is not simply bad judgment or negligence, but implies a dishonest purpose or some moral obliquity and a conscious doing of wrong."[160] Maryland courts hold that in the insurance context, a determination of whether an insurer reached a decision in good faith generally requires "an evaluation of the insurer's efforts to obtain information related to the loss, accurately and honestly assess this information, and support its conclusion with evidence obtained or reasonably available."[161]

Here, Hartford did not act in bad faith under Maryland law. Hartford acted

---

[157] Compl. ¶¶ 160-170.

[158] *Mount Vernon Props., LLC v. Branch Banking & Trust Co.*, 907 A.2d 373, 381 (Md. Ct. Spec. App. 2006).

[159] *Id.* at 381-82.

[160] *Rite Aid Corp. v. Hagley*, 824 A.2d 107, 116 (Md. 2003) (quoting *Catterton v. Coale*, 579 A.2d 781, 783 (Md. Ct. Spec. App. 1990)).

[161] *All Class Const., LLC v. Mut. Ben. Ins. Co.*, 3 F. Supp. 3d 409, 417 (D. Md. 2014) (applying Maryland law).

reasonably in denying NETworks and Troika's claims. The Court has already determined that the general impact of COVID-19 and the global pandemic do not constitute "direct physical loss" under Maryland law. Therefore, NETworks and Troika can't sustain a claim of breach of the implied covenant of good faith and fair dealing against Hartford solely for denying payment under the Standard Policy; the denial was reasonable.

What's more, Hartford followed ordinary claims-processing procedure when denying coverage. There is no evidence of the requisite "moral obliquity" or "conscious doing of wrong" to maintain a bad faith claim.[162] Instead, the record demonstrates that Hartford processed the claims, investigated them through reasonable means, and denied them in a prompt, routine manner.[163] The ordinary denial of an insurance claim does not amount to bad faith.

Both because the underlying coverage claim fails for the reasons already explained and there is no evidence supporting a charge of bad faith, summary judgment on NETworks and Troika's Count II must be **GRANTED.**

---

[162] *See Rite Aid Corp.*, 824 A.2d at 116.

[163] *See* Band's Visit Claim; Escape on Tour Claim.

-31-

**B. HARTFORD IS ENTITLED TO SUMMARY JUDGMENT ON BANDSTAND'S BREACH-OF-CONTRACT AND GOOD FAITH CLAIMS.**

**1. New Jersey law applies to Bandstand's claims.**

Hartford urges that New Jersey law applies to Bandstand's claims. Bandstand agrees. So, the Court applies New Jersey law here.[164]

**2. Under New Jersey law, "direct physical loss" unambiguously requires demonstrative damage.**

In New Jersey, the interpretation of an insurance policy is a question of law.[165] New Jersey courts first examine the plain language of the insurance policy and, if the terms are clear, give them "their plain, ordinary meaning."[166] Further, if there is no ambiguity in a policy's terms, those terms are enforced "as written."[167] If its terms are ambiguous, courts will ordinarily "construe [the] insurance contract ambiguities in favor of the insured via the doctrine of *contra proferentem*."[168] Generally, "the basic notion [is] that the premium paid by the insured does not buy coverage for all . . . damage but only for that type of damage provided for in the

---

[164] *See Golden Pacific Bancorp*, 273 F.3d at 514 n.4.

[165] *E.g.*, *Selective Ins. Co. of Am. v. Hudson E. Pain Mgmt. Osteopathic Med.*, 46 A.3d 1272, 1276 (N.J. 2012) ("An insurance policy is a form of contract, and the interpretation of contract language is a question of law.") (citations omitted).

[166] *Pizzullo v. New Jersey Mfrs. Ins. Co.*, 952 A.2d 1077, 1088 (N.J. 2008) (quoting *Zacarias v. Allstate Ins. Co.*, 775 A.2d 1262, 1264 (N.J. 2001)).

[167] *Zacarias*, 775 A.2d at 1266.

[168] *Oxford Realty Grp. Cedar v. Travelers Excess & Surplus Lines Co.*, 160 A.3d 1263, 1270-71 (N.J. 2017) (citing *Progressive Cas. Ins. Co. v. Hurley*, 765 A.2d 195, 202 (N.J. 2001)).

policy."[169]

New Jersey courts have interpreted the meaning of "direct physical loss" as used in insurance policies[170] and have "adopted a broad notion of the term physical."[171]  When "physical" is paired with another word, such as in "physical injury," New Jersey courts have found that the resulting term means a "detrimental alteration[]" or "damage or harm to the physical condition of a thing."[172]

With this, the phrase "direct physical loss" as it is used in Bandstand's Standard Policy isn't ambiguous.  The ordinary parlance and widely accepted definitions of the phrase's terms govern here: "direct physical loss" as it is used in the Standard Policy requires some level of demonstrable damage or harm to the physical condition of the subject property.  An average policyholder like Bandstand would well-understand that coverage would be extended only if the insured's property suffered a detrimental physical alteration or physical loss of some kind[173]

---

[169] *Weedo v. Stone-E-Brick, Inc.*, 405 A.2d 788, 790 (N.J. 1979).

[170] *See, e.g.*, *Phibro Animal Health Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 142 A.3d 761, 771-72 (N.J. Super. Ct. App. Div. 2016); *Customized Distrib. Servs. v. Zurich Ins. Co.*, 862 A.2d 560, 564-65 (N.J. Super. Ct. App. Div. 2004), *cert. denied*, 871 A.2d 91 (N.J. 2005).

[171] *Phibro Animal Health Corp.*, 142 A.3d at 771 (internal quotations omitted).

[172] *See id.* at 771-72 (citations omitted); *see also Port Auth. of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002) (predicting  what would become the law of New Jersey in an action against property insurers to recover costs of asbestos abatement, the Third Circuit observed that "[i]n ordinary parlance and widely accepted definition, physical damage to property means 'a distinct, demonstrable, and physical alteration' of its structure.") (quoting 10 Couch on Insurance § 148:46 (3d ed. 1998)).

[173] *See Mac Prop. Grp. LLC & The Cake Boutique LLC v. Selective Fire & Cas. Ins. Co.*, 278 A.3d 272, 284 (N.J. Super. Ct. App. Div.), *cert. denied sub nom. MAC Prop. Grp. LLC v. Selective*

and that damage, in turn, caused loss of business income.

### 3. COVID-19 did not cause demonstrable damage to Bandstand's (or dependent) property.

As established, "direct physical loss" requires demonstrable damage or harm to the physical condition of the insured's property under New Jersey law.[174] In applying this standard, New Jersey courts have required some sort of alteration to the property's physical structure.[175] For example, in *Mac Prop. Grp. LLC & The Cake Boutique LLC v. Selective Fire & Cas. Ins. Co.*, the plaintiffs were denied recovery under their property insurance policies for business income losses as a result of COVID-19 closures and restrictions.[176] Those plaintiffs' insurance policies obligated the insurers to "pay for direct physical loss of or damage to Covered Property," as well as for business loss "caused by direct physical loss of or damage"

*Fire & Cas. Ins. Co.,* 284 A.3d 440 (N.J.), *and cert. denied sub nom. MAC Prop. Grp. LLC v. Selective Fire & Cas. Ins. Co.*, 284 A.3d 443 (N.J. 2022).

[174] *See Id.*; *Phibro Animal Health Corp*, 142 A.3d at 771; *Port Auth. of New York & New Jersey*, 311 F.3d at 235.

[175] *See Rockleigh Country Club LLC v. Hartford Ins. Group et al.*, 2022 WL 2204374, at *4-5 (N.J. Super. Ct. App. Div. June 21, 2022) (affirming dismissal because a country club's pandemic-related losses were not direct physical loss or direct physical damage); *TMN LLC et al. v. Ohio Sec. Ins. Co.*, 2023 WL 1830456, at *2 (N.J. Super. Ct. App. Div. Feb. 9, 2023) (upholding dismissal of ice shops' claim for COVID-19 related losses because of the failure to show sustained property damage rendering the shops inoperable); *Pure Hair Salon LLC v. Hiscox Ins. Co. Inc.*, 2023 WL 2439546, at *4 (N.J. Super. Ct. App. Div. Mar. 10, 2023) (finding that, even if no virus exclusion existed, hair salon could not show that it sustained any direct physical loss of or damage to its facility due to COVID-19); *Appearance Workshop Inc. v. Mercer Ins. Co. of New Jersey Inc.*, 2023 WL 382305, at *2 (N.J. Super. Ct. App. Div. Jan. 25, 2023) (denying businesses' claims for pandemic-related loss coverage because no showing of direct physical loss or damage was made).

[176] *Mac Prop. Grp. LLC*, 278 A.3d at 278-80.

to plaintiffs' covered premises.[177]  In upholding the coverage denial, the appellate court found that "there was no damage to plaintiffs' equipment or property . . . that caused their premises to lose their physical capacity to operate, and there was no physical alteration that made their premises dangerous to enter" resulting in COVID-19 closures.[178]  The court further elaborated: "None of the plaintiffs' premises required any repairs due to damage, nor needed to be relocated and then reopened" due to COVID-19.[179]

Here too, there is nigh-on no evidence of demonstrable damage to Bandstand's (or dependent) properties.  And mere pandemic-related loss of use, access, or functionality is not enough for "direct physical loss or damage."

The proffered scientific evidence of COVID-19's physicality, even when viewed in the light most favorable to Bandstand, reveals no demonstrable damage to the physical condition of any of the venues at which Bandstand was scheduled to perform.  Like NETworks and Troika's failure to show that COVID-19 and its effects constitute direct, tangible, and concrete harm under Maryland law, Bandstand fails in its burden to show COVID-19 caused demonstrable damage to its property.[180]

---

[177]  *Id.* at 282-83.

[178]  *Id.* at 284-85.

[179]  *Id.* at 285.

[180]  See analysis in Part IV(A)(3), *supra*.  This is so even considering Bandstand's postulation that the appeal pending before the Supreme Court of New Jersey in *AC Ocean Walk, LLC v. Am. Guar. & Liab. Ins. Co.* might signal that New Jersey has no true definitive ruling on whether COVID-19 causes "direct physical loss or damage." *see* 288 A.3d 447 (N.J. 2023) (granting petition for

When looking for guidance beyond Maryland and New Jersey, it's informative that any number of sister state courts have upheld denials of insured's coverage claims brought under policies with identical or near-identical terms. In each instance, these courts have found denial of coverage for COVID-19 losses proper when the questioned policy included a physicality requirement.[181] Indeed,

certification of judgment in 2022 WL 2254864 (N.J. Super. Ct. App. Div. June 23, 2022)); Tours' Ans. Br. at 56-57.

[181] *See, e.g., Connecticut Dermatology Grp., PC v. Twin City Fire Ins. Co.*, 288 A.3d 187, 202-03 (Conn. 2023) ("[COVID-19] is not the type of physical contaminant that creates the risk of a direct physical loss because, once a contaminated surface is cleaned or simply left alone for a few days, it no longer poses any physical threat to occupants."); *Cajun Conti LLC v. Certain Underwriters at Lloyd's, London*, 359 So. 3d 922, 926-27 (La. 2023) (reinstating summary judgment dismissal because "the plain, ordinary and generally prevailing meaning of direct physical loss of or damage to property requires the insured's property sustain a physical, meaning tangible or corporeal, loss or damage" and COVID-19 did not cause such loss or damage) (internal citations omitted); *Verveine Corp. v. Strathmore Ins. Co.*, 184 N.E.3d 1266, 1275-78 (Mass. 2022) ("Evanescent presence of a harmful airborne substance that will quickly dissipate on its own, or surface-level contamination that can be removed by simple cleaning, does not physically alter or affect property."); *Starr Surplus Lines Ins. Co. v. Eighth Judicial Dist. Ct. in and for County of Clark*, 535 P.3d 254, 266-67 (Nev. 2023) (dismissing insured's claim on summary judgment despite scientific evidence that COVID-19 "is a physical particle" and of its "fomite-based transmission," because the evidence "does not demonstrate that the virus is harmful *to the property*" (emphasis in original)); *Schleicher and Stebbins Hotels, LLC v. Starr Surplus Lines Ins. Co.*, 302 A.3d 67, 77-81 (N.H. 2023) (reversing trial court's denial of summary judgment because COVID-19 does not change property in a distinct and demonstrable way, and the absence of a virus exclusion cannot be used to contradict the contract); *Hill & Stout, PLLC v. Mutual of Enumclaw Ins. Co.*, 515 P.3d 525, 532 (Wash. 2022) ("[T]he claim for loss of intended use and loss of business income [during the COVID-19 pandemic] is not a physical loss of property."); *Inns-by-the-Sea v. California Mut. Ins. Co.*, 286 Cal. Rptr. 3d 576, 591-95 (Cal. Ct. App. 2021) (finding that mere loss of the ability to use physical premises does not constitute direct physical loss of property, and that the absence of an exclusion cannot be used to create an ambiguity in an otherwise unambiguous insuring clause); *Commodore Inc. v. Certain Underwriters at Lloyd's, London*, 342 So. 3d 697, 702 (Fla. Dist. Ct. App. 2022) (denying coverage for a Miami café's financial losses after COVID-19 forced it to halt in-person dining service because the ordinary meaning of physical carries a tangible aspect); *MTDB Corp. v. Am. Auto Ins. Co.*, 2022 WL 18012348, at *5 (Ill. App. Ct. Dec. 30, 2022) (dismissing claim for pandemic-related losses because the likely presence of COVID-19 was insufficient proof that the virus caused physical loss or damage); *Isaac's At Spring Ridge LLP v. MMG Ins. Co.*, 2023 WL 4074057, at *4 (Pa. Super.

-36-

there has been near unanimity in both state and federal courts[182] that COVID-19 losses are not physical damage/loss in nature.  As for our federal siblings, they have found too that claimed business losses occasioned by COVID-19 government shutdown orders were not due to "physical loss or damage."[183]  Same here.

Ct. June 20, 2023) (affirming lower court's dismissal of restaurant's claim for coverage of losses due to COVID-19 because the policy required physical loss or damage).

[182] *See Carilion Clinic v. Am. Guarantee & Liab. Ins. Co*., 583 F. Supp. 3d 715, 722-25 (W.D. Va. 2022) (summarizing federal appellate court decisions, each concluding that property insurance policies providing coverage for direct physical loss of or damage to property do not cover property damage and business interruption losses stemming from COVID-19); *Promotional Headwear Int'l v. Cincinnati Ins. Co.*, 504 F. Supp. 3d 1191, 1200 (D. Kan. 2020) ("[T]he overwhelming majority of cases to consider business income claims stemming from COVID-19 with similar policy language hold that direct physical loss or damage to property requires some showing of actual or tangible harm to or intrusion on the property itself."). *See also, e.g., Olmsted Med. Ctr. V. Cont'l Cas. Co.,* 65 F.4th 1005, 1010 (8th Cir. 2023)) ("[A]lthough [COVID-19] may have a physical element, it does not have a physical effect on real or personal property.") (internal quotations and citations omitted); *Farmington Village Dental Associates, LLC v. Cincinnati Ins. Co*., 2022 WL 2062280, at \*1 (2d Cir. June 8, 2022) ("allegations that [COVID-19] causes physical loss or physical damage to [] property by way of its transmissibility through physical particles in the air and on surfaces fail to allege how the presence of those virus-transmitting particles *tangibly* alter or impact the property" (emphasis in original)); *Menominee Indian Tribe of Wisconsin v. Lexington Ins. Co.*, 556 F. Supp. 3d 1084, 1101 (N.D. Cal. 2021), ("the presence of a virus, which can be eliminated through cleaning and disinfecting, would not constitute a physical event that caused the loss") (internal citations omitted), *appeal dismissed*, 2022 WL 19697110 (9th Cir. Oct. 7, 2022); *Kim-Chee LLC v. Philadelphia Indem. Ins. Co*., 535 F. Supp. 3d 152, 158-160 (W.D.N.Y. 2021) (adopting the reasoning of other New York courts that COVID-19 does not cause direct physical loss or damage because it does not alter the characteristics of the covered property and is rendered harmless by the passage of a few days), *aff'd*, 2022 WL 258569 (2d Cir. Jan. 28, 2022);*Ceres Enterprises, LLC v. Travelers Ins. Co.*, 520 F. Supp. 3d 949, 961-62 (N.D. Ohio 2021) (finding that the mere physical presence of the virus on property does not constitute physical loss under the applicable policy or Ohio law).

[183] *E.g.*, *Estes v. Cincinnati Ins. Co*., 23 F.4th 695, 700 (6th Cir. 2022) ("The average person would not say that [insured] suffered a physical loss of its dental offices when describing the harms that befell it in this case.  COVID-19 did not destroy its dental offices, and the government shutdown orders did not dispossess it of them for a single day. [Insured] bought a property insurance policy, not a profit insurance policy.") (cleaned up); *Santo's Italian Café, LLC v. Acuity Ins. Co*., 15 F.4th 398, 401 (6th Cir. 2021) ("Whether one sticks with the terms themselves (a direct physical loss of property) or a thesaurus-rich paraphrase of them (an immediate tangible deprivation of property), the conclusion is the same. The policy does not cover this loss resulting from the suspension of

Bandstand has not presented a genuine issue for trial under New Jersey law, so summary judgment on its claim in Count I and for associated declaratory relief in Count III is **GRANTED** to Hartford.

### 4. Hartford did not act in bad faith toward Bandstand.

Hartford is also entitled to summary judgment on Bandstand's claim of bad faith. Under New Jersey law, an insurance company owes a duty of good faith to its insured in processing a first-party claim. Indeed, under New Jersey law, there is an implied covenant of good faith and fair dealing in every contract.[184] Bad faith is not explicitly defined in New Jersey, but courts have emphasized that "principles of equity, fair dealing and good faith" govern the contractual relationship between insured and insurer.[185] Here, Hartford did not act in bad faith toward Bandstand.

First, Hartford acted reasonably in denying Bandstand's claim. Bandstand's

---

business operations during the COVID-19 pandemic.") (cleaned up); *Bradley Hotel Corp. v. Aspen Specialty Ins. Co.,* 19 F.4th 1002, 1007-08 (7th Cir. 2021) (finding that government closure orders caused a mere loss of use of property without any physical alteration, not direct physical loss or damage); *Oral Surgeons, P.C. v. Cincinnati Ins. Co*., 2 F.4th 1141, 1145 (8th Cir. 2021) (determining that losses due to government-imposed restrictions related to COVID-19 do not constitute direct physical loss or damage to property); *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am*., 15 F.4th 885, 889, 894 (9th Cir. 2021) (affirming district court's dismissal because the insured "fail[ed] to allege any intervening physical force beyond the government closure orders" that caused direct physical loss of or damage to insured's property); *Michael Cetta, Inc. v. Admiral Indem. Co.*, 506 F. Supp. 3d 168, 179 (S.D.N.Y. 2020) (concluding that loss of use of premises due to a governmental closure order "does not trigger business income coverage premised on physical loss to property").

[184] *Onderdonk v. Presbyterian Homes of New Jersey*, 425 A.2d 1057, 1062 (N.J. 1981); *Bak–A–Lum Corp. of Am. v. Alcoa Bldg. Prods., Inc.*, 351 A.2d 349, 352 (N.J. 1976); *Palisades Properties, Inc. v. Brunetti*, 207 A.2d 522, 531 (N.J. 1965).

[185] *Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am.*, 323 A.2d 495, 504 (N.J. 1974).

Standard Policy required "direct physical loss," which New Jersey law defines as requiring demonstrable damage to the insured's property.[186] COVID-19 and its effects did not cause "demonstrable damage" to Bandstand's (or dependent) property. So, Hartford's denial was reasonable.

Second, just as with the denial of NETworks and Troika's claims, the record shows that Hartford followed standard procedure in its handling of Bandstand's claim.[187] There's no evidentiary support for any suggestion that Hartford violated principles of equity, fair dealing and good faith under New Jersey law when denying Bandstand's requested coverage.

Summary judgment on Bandstand's claim of breach of the implied covenant of good faith and fair dealing in Count II is **GRANTED.**

### C. HARTFORD IS ENTITLED TO SUMMARY JUDGMENT ON HOSANNA'S BREACH-OF-CONTRACT AND GOOD FAITH CLAIMS.

#### 1. Hosanna's claims are governed by New Jersey law.

Hartford urges that New Jersey law applies for Hosanna's claims, and Hosanna agrees. Because both parties agree, the Court turns to New Jersey law.[188]

#### 2. The Theatrical Extension in Hosanna's policy is unambiguous.

New Jersey law governs the interpretation of Hosanna's Theatrical

---

[186] *See supra* Part IV(B)(2)-(3).

[187] *See* Band's Visit Claim.

[188] *See Golden Pacific Bancorp*, 273 F.3d at 514 n.4.

-39-

Extension.[189] Unlike the Non-Hosanna tours' Standard Policy, Hosanna's policy includes the Theatrical Extension which has no "physical loss or damage" requirement.[190] So, the Hosanna policy covers "the actual loss of Business Income you sustain due to the necessary[] interruption, postponement or cancellation of a production due to a 'covered occurrence.'"[191] It also provides a $1.4 million Business Income limit "per occurrence."[192]

### 3. The "Covered Occurrence" was the pandemic as a whole, not individual jurisdictions' or venues' closures.

The key terms of the Hosanna Policy's Theatrical Extension are unambiguous. A "covered occurrence" is indeed defined in the policy as "any unexpected circumstances beyond your control except as listed in the Exclusions."[193] And the listed exclusions include specific circumstances that are not "covered occurrences," including strikes, weather conditions, and loss of financial support.[194] But one cannot start there.

The Theatrical Extension coverage provision states that coverage will be extended for loss sustained "due to ***the*** necessary, interruption, postponement or

---

[189] For the governing New Jersey rules on contract interpretation, see *supra* Part IV(B)(2).

[190] *See* Hosanna Policy.

[191] *Id*. (Theatrical Extension) § B.1.a.

[192] *Id*. § Schedule.

[193] *Id*. § B.9.a.

[194] *Id*. § B.4.

-40-

cancellation of a production due to a 'covered occurrence.'"[195] When viewed in its contractual context,[196] it is "***the***" event of necessary interruption, postponement or cancellation of a production that's covered.[197] And it matters not the duration of the production's shutdown—*i.e.* that it is days, weeks, or months, spanning multiple performances and venues—just its root cause and continuation from that single "covered occurrence." This makes sense when giving a natural read to the contract as a whole.[198] The Theatrical Extension plainly and unambiguously insures Hosanna for each interruption that begins and endures because of a covered occurrence; it does not break that single interruption (even if prolonged) down by performance or

---

[195] *Id*. § B.1.a. (punctuation errors in original) (emphasis added).

[196] *See Prather v. Am. Motor. Ins. Co.*, 67 A.2d 135, 138 (N.J. 1949) (applying the "elemental rule of construction" that a contract will be "read and considered as a whole.").

[197] "The" is a word of limitation that particularizes the subject it precedes, as opposed to the indefinite or generalizing force of 'a' or 'an.'" *Black's Law Dictionary* 1477 (6th ed. 1990) ("In construing statute, definite article 'the' particularizes the subject which it precedes and is word of limitation as opposed to indefinite or generalizing force 'a' or 'an'"); *Brooks v. Zabka,* 450 P.2d 653, 655 (Colo. 1969) (describing principle as "a rule of law well established"); *Stephan v. Pennsylvania General Insurance Co*., 621 A.2d 258, 261 (Conn. 1993) (applying same principle to construction of insurance policy); *see Pike Creek Recreational Servs., LLC v. New Castle Cnty.*, 238 A.3d 208, 213-14 (Del. Super. Ct. 2020) (explaining that "Delaware applies equivalent interpretive rules in the statutory and contractual contexts"). Here, the "the" does important work. *See Weinberg v. Waystar, Inc.*, 249 A.3d 1039, 1044 (Del. 2023) (providing an important reminder that resolution of a contract dispute sometimes "lies in the correct interpretation of . . . one of the most common words in the English language"—the word "and" in that case—and "[o]ne should not be fooled by the size and ubiquity of the word" at issue, because even the use or specific placement of a "seemingly simple word in legal drafting" is critical).

[198] *See Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Co. LLC*, 166 A.3d 912, 913-14 (Del. 2017) ("In giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract.").

venue.[199]

Not so, says Hosanna. In its view, each individual government closure constitutes a "covered occurrence" under the Hosanna Policy. As such, Hosanna believes that the $1.4 million policy limit should be applied on a per-show or per-venue basis, not to the production cancellation in its entirety. This postulation fails both factually and as a matter of contract interpretation.

First, the facts bear out that the "interruption, postponement or cancellation" of Hosanna's "production" was caused by the pandemic as a whole, not individual closures. New Jersey courts use the majority-rule "cause test" to determine number of occurrences under a liability insurance policy.[200] That is of utility here. Under the cause test, the Court asks if there was but one proximate, uninterrupted, and continuing cause that resulted in all the claimed injuries and damage.[201] New Jersey

---

[199] In opposition, Hosanna cites to the Southern District of New York's decision in *Jujamcyn Theaters LLC v. Fed. Ins. Co.* as support for its argument that the term "covered occurrence" is ambiguous. 2023 WL 2366789 (S.D.N.Y. Mar. 6, 2023); Tours' Ans. Br. at 51-52. In *Jujamcyn*, however, the ambiguity stemmed not from the term "occurrence," but from the term "loss," which was defined differently. *Id.* at *2. Additionally, the *Jujamcyn* decision was made at the pleadings stage and the *Jujamcyn* court did not then resolve the issue on the pleadings because it would be inappropriate to do so. *Id.* at *7. In contrast, this matter is now on summary judgment and the interpretation of the entirety of the policy's operative terms is a matter of law that the Court must resolve. *EQR-LPC Urb. Renewal N. Pier, LLC v. City of Jersey City*, 173 A.3d 243, 249 (N.J. Super. Ct. App. Div. 2016) ("Contractual interpretation is a legal matter ordinarily suitable for resolution on summary judgment.") (citations omitted), *aff'd*, 173 A.3d 184 (N.J. 2017).

[200] *Doria v. Ins. Co. of N. Am.*, 509 A.2d 220, 223-24 (N.J. Super. Ct. App. Div. 1986).

[201] *See id.*; *see also Westinghouse Elec. Corp. v. Am. Home Assurance Co.,* 2004 WL 1878764, at *27 (N.J. Super. Ct. App. Div. July 8, 2004) (stating the general rule but applying Pennsylvania law).

-42-

courts have elaborated that if injuries "are so closely linked in time and space as to be deemed by the average person as a single event, there is but one occurrence."[202] Comparatively, "if enough time has elapsed between the injuries or damages to the various items involved or if the latter are widely separated in space, the courts have been inclined to allow separate claims even though they sprang from the same cause."[203]

Without doubt, Hosanna's production was suspended due to the pandemic as a single event. When the COVID-19 pandemic struck, the entertainment industry shut down. As part of that industry, Hosanna suspended its touring production in March 2020. While government closure orders ensued, those orders cannot be excised from the body of the pandemic as instigator. The cause of Hosanna's continuous production interruption wasn't the intermittent government orders, but the pandemic as a singular force causing proximate, uninterrupted, continuing closure of the nation.[204]

---

[202] *Bomba v. State Farm Fire & Cas. Co*., 879 A.2d 1252, 1255 (N.J. Super. Ct. App. Div. 2005) (quoting *Doria*, 509 A.2d at 221).

[203] *Doria*, 509 A.2d at 224 (citations omitted).

[204] When applying this cause test, decisions in other jurisdictions with analogous facts are helpful. In *Owens-Illinois, Inc v Aetna Casualty & Surety Co*, the action concerned claims brought against the policyholder by plaintiffs exposed to its asbestos-containing products. 597 F. Supp. 1515, 1517 (D.D.C. 1984). The federal district court there held that "the underlying circumstance that gave rise to the claims for damages was [the policyholder's] manufacture and sale of a hazardous asbestos containing product." *Id.* at 1527. That circumstance constituted a single occurrence. *Id.* And in *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, a company's discriminatory employment policies were found to be a singular occurrence for purposes of policy coverage in a class action sex discrimination lawsuit. 676 F.2d 56, 58-63 (3d Cir. 1982). The Third Circuit explained that

Second, the term "covered occurrence" cannot be reasonably interpreted to include specific government closure orders when reading the entire policy. "A basic principle of contract interpretation is to read the document as a whole in a fair and common-sense manner."[205]  Indeed, the Court "will, if possible, give effect to all parts of the instrument, and an interpretation which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable."[206]

In the Civil Authority provision of Hosanna's policy, coverage is extended to "*actions of civil authority*" that are "*caused by or result from* a 'covered occurrence.'"[207]  Were the term "covered occurrence" interpreted to include actions of civil authority such as closure orders, then those orders would be both the covered occurrence *and* the cause of the covered occurrence per the terms of the Civil Authority coverage provision.  The Court cannot reasonably interpret the policy this way.

Based on the plain and unambiguous terms of the Hosanna Policy and the facts presented, the Court finds that Hosanna is not entitled to additional payments

---

"as long as the injuries stem from one proximate cause there is a single occurrence." *Id*. at 61 (citation omitted).  Just so here.

[205] *Hardy ex rel. Dowdell v. Abdul-Matin*, 965 A.2d 1165, 1169 (N.J. 2009) (citation omitted).

[206] *Maryland Cas. Co. v. Hansen–Jensen, Inc.*, 83 A.2d 1, 4 (N.J. Super. Ct. App. Div. 1951) (citations omitted).

[207] Hosanna Policy (Theatrical Extension) § B.3.

from Hartford. Accordingly, summary judgment for Hartford on Count VI is **GRANTED**.

### 4. Hartford did not act in bad faith toward Hosanna.

Hartford is entitled to summary judgment on Hosanna's bad faith claim under New Jersey law.[208] The record shows that Hartford paid Hosanna the full amount allowed under the policy for what it rightly deemed to be a single "covered occurrence."[209] Again, the ordinary claim-processing procedure was followed in responding to Hosanna's second request for coverage under its policy. In turn, the request was properly and promptly investigated and denied.[210] There is no evidence of bad faith.

Contrary to Hosanna's contentions, the appropriate question at this stage is not merely whether Hartford's denial was at the time *debatable* because bad faith requires more than just a debatable claims decision.[211] Moreover, Hosanna can point to no evidence that Hartford made what it dubs a debatable decision in an unreasonable manner. Accordingly, summary judgment on Count VII is GRANTED to Hartford.

---

[208] See *supra* Part IV(B)(4) for the governing rules on bad faith in New Jersey.

[209] Hosanna Claim Payment.

[210] *See id.*

[211] *Badiali v. New Jersey Mfrs. Ins. Grp.*, 107 A.3d 1281, 1288 (N.J. 2015) ("[M]ere failure to settle a debatable claim does not constitute bad faith.").

**D. HARTFORD IS ENTITLED TO SUMMARY JUDGMENT ON THE TOURS' FRAUD CLAIM.**

Maryland law governs the NETworks tours' fraud claim (Count IV).[212] Here, the NETworks tours allege that Mr. Middleton and MDP, acting as Hartford's agents, perpetuated a fraud regarding the addition of the Theatrical Extension (or, in NETworks' view, an unjustified failure to effect its addition) to the NETworks tours' policies. Summary judgment dismissal of this fraud claim is warranted because: (1) Mr. Middleton and MDP were not Hartford's agents; and (2) the record is devoid of facts showing that Hartford perpetuated a fraud.

1. **Mr. Middleton and MDP's relationship with Hartford was not such that it could visit fraud liability upon Hartford.**

Hartford first argues that it is entitled to summary judgment on the NETworks tours' fraud claim because neither MDP nor Mr. Middleton are (or were) Hartford's agents, so Hartford cannot be held liable for any alleged misrepresentations by them.[213] Under Maryland law, an insurance "broker"[214] is generally the "agent of

---

[212] *See supra* Part IV(A)(1).

[213] Hartford's Open. Br. at 50-53, 62-64.

[214] A "broker" is defined in Maryland Code § 1–101(i) of the Insurance Article ("Insur.") as follows:

(i) Broker.—"Broker" means a person that, for compensation, solicits, procures, or negotiates insurance contracts or the renewal or continuance of insurance contracts:

(1) for insureds or prospective insureds other than the broker; and

(2) not for an insurer or agent.

MD. CODE ANN. Insur. § 1–101(i) (2020).

-46-

the insured, not the insurer."[215]  As Maryland's highest court has explained:

> An insurance . . . broker[] is one who acts as a middleman between the assured and the insurer, and who solicits insurance from the public under no employment from any special company, but having secured an order, either places the insurance with a company selected by the assured, or in the absence of any selection by him, then with a company selected by the broker. Ordinarily, the relation between the insured and the broker is that between principal and agent.[216]

Just so here—neither Mr. Middleton nor MDP were Hartford's agents.  To start, Mr. Middleton and MDP are not employed by Hartford.  Instead, MDP is an independent company utilized by, but not tied to, multiple insurance providers.

Next, Mr. Middleton and MDP did not have the power to set the terms of any policies on behalf of Hartford.  The Agency Agreement between Hartford and MDP grants limited authority, only exercisable with Hartford's ultimate approval, to "solicit, quote and bind insurance" on behalf of Hartford.[217]  This agreement allowed for MDP and Mr. Middleton to serve only as a middleman.  The limitations of that arrangement are evidenced by the repeated back-and-forth emails between Mr. Middleton and Hartford, in which Mr. Middleton had to ask for permissions and Hartford's position on every aspect of the policy provisions before any were implemented.  As is clear from the record, and supported by Maryland law, MDP

---

[215] *Green v. H & R Block, Inc.*, 735 A.2d 1039, 1054 (Md. 1999).

[216] *Id*. (quoting *American Casualty Co. v. Ricas*, 22 A.2d 484, 487 (Md. 1941)).

[217] Agency Agreement § II.1(a).

and Mr. Middleton weren't Hartford's agents upon whose statements Hartford's fraud liability could be built.

NETworks contends that even if MDP and Mr. Middleton were independent insurance brokers, a sufficient principal-agent relationship existed between them and Hartford in this instance.[218] The components of a principal-agent relationship in Maryland were described comprehensively in *Green v. H&R Block*.[219] In *Green*, the Maryland high court used three non-determinative factors to determine the existence of an agency relationship: (1) the principal's right of control over the agent, (2) the agent's duty to act primarily for the benefit of the principal, and (3) the agent's power to alter the legal relations of the principal.[220] These three factors adapted in *Green* are "neither exclusive nor conclusive considerations in determining the existence of an agency relationship."[221] Indeed, said the *Green* court, "the primary determination of whether a principal-agent relationship exists involves ascertaining the parties' intent, as evidenced by their agreements and actions."[222]

Here, the record does not support a finding that MDP and Mr. Middleton were in a principal-agent relationship with Hartford. Mr. Middleton's duty was to act

---

[218] Tours' Ans. Br. at 33-36.

[219] 735 A.2d 1039, 1048-49 (Md. 1999).

[220] *Id.* at 1048.

[221] *Id.* at 1049.

[222] *Id.*

primarily for the benefit of NETworks, not for Hartford. Both Mr. Middleton and NETworks understood that he was acting on NETworks' behalf to solicit and procure insurance for upcoming shows.[223] If the agent of anyone, Mr. Middleton was the agent of NETworks. What's more, Mr. Middleton had absolutely no power to set or alter the terms of Hartford's insurance policies. In short, there's next to nothing to support a finding of a principal-agent relationship between Mr. Middleton and Hartford.

Maryland law is clear—insurance brokers are not agents of the insurer. Here, MDP and Mr. Middleton were independent insurance brokers. Given that, Hartford cannot be held vicariously liable for Mr. Middleton's representations in assisting NETworks to seek out and attempt to procure certain policy coverage.

### 2. NETworks fails to show Hartford perpetuated a fraud.

The NETworks tours contend that the back-and-forth between Ms. Gladding (on behalf of Hartford), Mr. Middleton, and NETworks supports its charge that Hartford fraudulently misrepresented that the Theatrical Extension would be added to existing insurance policies for the 2019-2020 touring season. On each and every element of their fraud claim, the NETworks tours fall short.

Under Maryland law, "[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent

---

[223] Middleton Dep. 31 ("We always represent the policyholder."); NETworks Exec. Dep. 69-71.

inducement."[224]  Regardless of the particular theory, the plaintiff must establish the

elements of fraud "by clear and convincing evidence."[225]  To assert a fraud claim, a

plaintiff must show:

> (1) the defendant made a false representation to the plaintiff,
> (2) the falsity of the representation was either known to the
> defendant or the representation was made with reckless
> indifference to its truth, (3) the misrepresentation was made for
> the purpose of defrauding the plaintiff, (4) the plaintiff relied on
> the misrepresentation and had the right to rely on it, and (5) the
> plaintiff suffered compensable injury as a result of the
> misrepresentation.[226]

To reiterate, Maryland's clear-and-convincing burden of proof applies to each

individual element of one's fraud claim.[227]

At the outset, neither Hartford nor Mr. Middleton made any false

representations to NETworks.  A "false representation" is a statement, conduct, or

action that intentionally misrepresents a material fact.[228]  "A material fact is one on

which a reasonable person would rely in making a decision,"[229] or a fact that "the

---

[224] *Sass v. Andrew*, 832 A.2d 247, 261 (Md. Ct. Spec. App. 2003) (citations omitted).

[225] *Md. Envtl. Trust v. Gaynor*, 803 A.2d 512, 516 (Md. 2002); *see also First Nat'l Bank v. U.S.F. & G. Co.*, 340 A.2d 275, 283 (Md. 1975) ("When fraud . . . is imputed, something more than a mere preponderance of evidence must be produced . . . .").

[226] *White v. Kennedy Krieger Inst., Inc.*, 110 A.3d 724, 744 (Md. Ct. Spec. App. 2015) (quoting *Hoffman v. Stamper*, 867 A.2d 276, 292 (Md. 2005)).

[227] *Central Truck Center, Inc. v. Central GMC, Inc.*, 4 A.3d 515, 522-23 (Md. Ct. Spec. App. 2010) ("A plaintiff must present clear and convincing evidence of each element in its claims." (citing *Gourdine v. Crews*, 955 A.2d 769, 791 (Md. 2008))).

[228] *Sass*, 832 A.2d at 260 (citations omitted).

[229] *Id.* (internal quotations omitted).

maker of the misrepresentation knows . . . [the] recipient is likely to regard . . . as important . . . ."[230]

There's no evidence that Hartford itself made false representations to NETworks. Through multiple back-and-forth emails, Hartford communicated with Mr. Middleton about adding the Theatrical Extension to renewals and new shows. At no point did Hartford misrepresent, intentionally or not, that the Theatrical Extension were or would be, without further negotiation, added to Networks' *existing* policies.

Even if Hartford could be held liable for Mr. Middleton's representations, the extensive record developed does not demonstrate that his future hopeful promises rise to the level of present falsity. It is well-established that "fraud cannot be predicated on statements which are merely promissory in nature, or upon expressions as to what will happen in the future."[231] Therefore, "an action for deceit will not lie for the unfulfillment of promises or the failure of future events to materialize as predicted."[232] On multiple occasions, Mr. Middleton was overly enthusiastic and unduly positive in relaying the progress on the development and availability of the sought-after Theatrical Extension. But he was not then being presently deceitful.

---

[230] *Gross v. Sussex Inc.*, 630 A.2d 1156, 1161 (Md. Ct. Spec. App. 1993) (citations omitted).

[231] *Sass*, 832 A.2d at 265 (quoting *Levin v. Singer*, 175 A.2d 423, 432 (Md. Ct. Spec. App. 1961)).

[232] *Appel v. Hupfield*, 84 A.2d 94, 96 (Md. 1951).

The failure of future events to materialize as hoped and predicted does not amount to fraud on Mr. Middleton's part or, by extension, Hartford's based on his representations about the Theatrical Extension. No one could have foreseen the COVID-19 pandemic's sudden arrival and eventual effect; those events simply outpaced the development and final negotiations needed for the addition of the Theatrical Extension to NETWorks' extant policies in March 2020.

NETworks likewise cannot meet its burden on the knowledge requirement. The second element of fraud requires that an alleged fraudster must "know . . . that his representation is false" or be "recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity."[233] A "reckless indifference to truth" arises when one makes the representation even though he's aware that he does not know whether it is true or false. Put differently, one is recklessly indifferent to the truth when he knows he lacks knowledge as to the truth or falsity of his representation, but nonetheless makes that representation without caring about his own lack of knowledge.[234]

Again, nowhere does NETworks identify facts demonstrating Hartford itself knew its representations were "false." Nor does the record show that Hartford had a reckless indifference to the truth. In fact, it appears that Hartford was genuinely

[233] *Ellerin v. Fairfax Sav., F.S.B.*, 652 A.2d 1117, 1125 (Md. 1995).

[234] 11 M.L.E. Fraud and Negligent Misrepresentation § 10 (citing *Hoffman v. Stamper*, 867 A.2d 276, 300-01 (Md. 2005)).

working to develop a Theatrical Extension for the NETworks tours to use and negotiating with NETworks about its future implementation. Once again here, Mr. Middleton's exuberant promises of imminent action on the Theatrical Extension in this context are insufficient to demonstrate any knowledge of falsehood or reckless indifference to truth on his part.

Nor can an intent to deceive be derived from the record. Maryland courts require a "deliberate"[235] fraudulent representation made with "an intention that another should believe it to be true and act upon it."[236] That is, Maryland's scienter element requires not just a false statement but also an "evil motive or bad intent."[237] None is evident here.

Additionally, NETworks fails to show its reliance on any purported misrepresentations. This necessary element of a fraud claim requires proof that "the plaintiff relied on the misrepresentation and had the right to rely on it."[238] Reliance at its core is the action or inaction of a party that results from the misrepresentation of another.[239] In determining if reliance is reasonable, a court is required to "view

---

[235] *VF Corp. v. Wrexham Aviation Corp.,* 715 A.2d 188, 193 (Md. 1998) (quoting *Ellerin,* 652 A.2d at 1124)).

[236] *Id.* (quoting *McAleer v. Horsey*, 35 Md. 439, 453 (Md. 1872)).

[237] *Ellerin*, 652 A.2d at 1124.

[238] *Hoffman*, 867 A.2d at 292 (citations omitted).

[239] *Nails v. S & R, Inc.*, 639 A.2d 660, 669 (Md. 1994) (finding that reliance exists if "the misrepresentation substantially induced the plaintiff to act").

the act in its setting, which will include the implications and promptings of usage and fair dealing."[240]

But reliance on Hartford or Mr. Middleton's representations complained-of here can't support the fraud claim NETworks champions. Those representations of imminence were made only after the existing policies were entered into. The NETworks tours bound coverage with Hartford in late March and early April 2019 for their 2019-2020 touring productions.[241] At the time these policies were signed, no Theatrical Extension even existed.[242] Instead, Mr. Middleton had merely conceptualized the idea and had shared it with Ms. Gladding.[243] There is no indication that the NETworks tours relied on any promises of later addition of the as-yet-nonexistent Theatrical Extension when they entered into their 2019-2020 policies. As for the communications that occurred between September 2019 and March 2020, there is no evidence that NETworks relied to their detriment on any of the predictions made then. Nor could they—each NETworks tour was already insured under existing policies and had yet to renew or sign new ones.

---

[240] *Giant Food v. Ice King*, 536 A.2d 1182, 1186 (Md. Ct. Spec. App. 1988) (quoting *Glanzer v. Shepard*, 135 N.E. 275, 276 (N.Y. 1922)).

[241] *See, e.g.*, Standard Policy; *see also* Hartford's Open. Br. at 11. Those one-year policies took effect months later—between late June and late October 2019. *Id.*

[242] *See* Email from Gladding to Middleton 05/21/19 (informing Middleton that the Theatrical Extension would not be ready until "3rd quarter 2019"–*i.e.*, in July at the earliest).

[243] *See id.*; Emails between Middleton and Gladding May 2018.

NETworks attempts to use Mr. Middleton's January 14, 2019 email to NETworks stating that the Theatrical Extension would be added "automatically on renewals and new shows" as evidence that they relied on his representations when signing the policies for 2019-2020.[244] But as that same email clarifies, "to provide on existing shows it has to be done by endorsement."[245] The email does not purport to show a misrepresentation on which the NETworks could have relied on to enter into their 2019-2020 policies. Instead, it states that renewals and new shows would include the not-yet-finalized Theatrical Extension but, absent a separate endorsement by Hartford, the extension would not be part of policies that were in-effect during its final development.

Finally, NETworks suffered no compensable injury. To constitute cognizable fraud, "it must appear that the plaintiff actually suffered damage directly resulting from the fraud."[246] Fraud without a resulting injury is not actionable.[247] The NETworks tours state that they forewent seeking out and signing other policies containing no "direct physical loss" requirement, and therefore they suffered a

---

[244] Email from Middleton to NETworks 01/14/19.

[245] *Id.*

[246] 11 M.L.E. Fraud and Negligent Misrepresentation § 14 (citing *Empire Realty Co. Inc. v. Fleisher*, 305 A.2d 144, 147 (Md. 1973); *Diener Enterprises, Inc. v. Miller*, 371 A.2d 439, 441 (Md. Ct. Spec. App. 1977)).

[247] *Id.* (citing *Educ. Testing Serv. v. Stanley H. Kaplan, Educ. Ctr., Ltd.*, 965 F. Supp. 731, 740 (D. Md. 1997) (applying Maryland law)).

compensable injury based on the alleged misrepresentations. The record says differently. The NETworks tours did not change their position on then-existing coverage—they just didn't get the extra coverage from Hartford they hoped for.

Summary judgment for Hartford on the fraud claim (Count IV) is **GRANTED**.

### E. HARTFORD IS ENTITLED TO SUMMARY JUDGMENT ON NETWORKS CLAIM FOR DECLARATORY RELIEF SEEKING MODIFICATION OF THEIR POLICIES.

Lastly, Hartford moves for summary judgment on the NETworks tours' request for a declaration that each show's Standard Policy includes the Theatrical Extension in accord with Hartford's purported express and implied representations.[248]

Delaware's Declaratory Judgment Act empowers this Court to "declare rights, status and other legal relations whether or not further relief is or could be claimed."[249] But "[n]ot all disputes . . . are appropriate for [a declaration] when the parties request it."[250] The Court "has discretion to decline declaratory judgment jurisdiction, and will do so where a proposed declaration would not advance the

---

[248] Compl. ¶¶ 199-205.

[249] DEL. CODE ANN. tit. 10, § 6501-13 (2022). The "purpose of the Declaratory Judgment Act is to enable the courts to adjudicate a controversy prior to the time when a remedy is traditionally available and, thus, to advance the stage at which a matter is traditionally justiciable." *Reylek v. Albence*, 2023 WL 4633411, at *6 (Del. Super. Ct. July 19, 2023) (quoting *Diebold Computer Leasing, Inc. v. Commercial Credit Corp.*, 267 A.2d 586, 591–92 (Del. 1970)) (cleaned up).

[250] *Intermec IP Corp. v. TransCore, LP*, 2021 WL 3620435, at *25 (Del. Super. Ct. Aug. 16, 2021) (quoting *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 816 (Del. 2018)).

litigation, but rather, would waste judicial resources."[251]

Prior to entertaining a declaratory judgment action, the Court must first make a threshold determination that an "actual controversy" exists.[252] An "actual controversy" has four elements:

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.[253]

With respect to the second element, "[a]n actual controversy which justifies resort to the declaratory judgment act exists where one side makes a claim of a present, specific right and the other side makes an equally definite claim to the contrary."[254]

The fourth requires that a controversy be "ripe."[255] To make a ripeness determination, Delaware courts "weigh the reasons 'for not rendering a hypothetical opinion . . . against the benefits to be derived from the rendering of a declaratory

---

[251] *Id.* (citations omitted).

[252] *Reylek*, 2023 WL 4633411, at *6 (quoting *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1216 (Del. 2014)).

[253] *Id.* (citations omitted).

[254] *In re COVID-Related Restrictions on Religious Servs.*, 302 A.3d 464, 494 (Del. Super. Ct. 2023) (quoting *Clemente v. Greyhound Corp.*, 155 A.2d 316, 320 (Del. Super. Ct. 1959)).

[255] *Id.*

judgment.'"[256] Such a balancing necessitates "the exercise of judicial discretion which should turn importantly upon a practical evaluation of the circumstances present."[257] Put simply, "for a case to be ripe, the facts must be sufficiently developed for the court to resolve the matter."[258] And "if the Court would be forced to construct hypothetical factual situations on which it could then rule then the ripeness requirement is not met."[259]

For two reasons, the Court should not and cannot render the declaration sought here—that is, add the Theatrical Extension (with premiums and limits the tours never pin down) to each NETworks tours' show's then-extant Standard Policy.

First, no actual controversy exists surrounding the Standard Policy's modification or the method to effect such. The Standard Policy includes a "Changes" provision that states that its "terms can be amended or waived only by endorsement issued by [Hartford] and made a part of this policy."[260] Hartford points to the "Changes" provision's endorsement requirement as conclusive evidence that

---

[256] *Id*. (quoting *The O'Brien Corp. v. Hunt-Wesson, Inc.*, 1999 WL 126996, at *4 (Del. Ch. Feb. 25, 1999) (quoting *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989)).

[257] *Id.* (internal quotations and citations omitted).

[258] *Id*. Of course, with the other claims at play and the resolution of those claims above, there might also be an "overripeness" concern lurking in the background of this particular declaratory judgment proceeding. *See generally CRE Niagara Holdings, LLC v. Resorts Grp., Inc.*, 2023 WL 2625838, at *9-12 (Del. Super. Ct. Mar. 24, 2023) (explaining and engaging the overripeness analysis employed by Delaware courts).

[259] *In re COVID-Related Restrictions*, 302 A.3d at 494 (cleaned up).

[260] Standard Policy (Common Policy Provisions) § B.

-58-

the Standard Policy was never modified to include the Theatrical Extension.[261] In its response, the NETworks tours appear to concede the issue. They parry that "[t]he question is not whether the policies contained the Theatrical Extension, but whether [Mr.] Middleton represented that Hartford would add it to them."[262] NETworks sidesteps the "Changes" provision and the endorsement requirement. So, the NETworks tours have not established that there is an actual controversy as to whether the Standard Policy was modified to include the Theatrical Extension. In fact, the NETworks tours have confessed the opposite is true but hopes the Court will inflict such modification outside the policy's clear terms.

Second, there are far too many uncertainties for the court to provide any sort of declaratory relief. To declare that the Theatrical Extension is a part of the Standard Policy, the Court would need to determine for each different show, *inter alia*: (1) the amount of premiums to be paid; (2) when in the life of the policy the Theatrical Extension took force; and, (3) the per occurrence limits afforded by the extension. As a prudential matter, the Court should not exercise its discretion to make the nebulous declaration the tours seek when there are so many very real gaps to fill. In declaratory judgment terms, the facts in question are not sufficiently developed and the modification question is not ripe for judicial determination. In

---

[261] Hartford's Open. Br. at 45-46.

[262] Tours' Ans. Br. at 40.

more practical terms, the tours' ask amounts to that which a Delaware court eschews without fail—using litigation and the Court to rewrite a deal.[263]

Summary judgment on Count V asking for just such relief via the Declaratory Judgment Act is **GRANTED**.

## V. CONCLUSION

In March 2020, COVID-19 brought the world to a screeching halt. Its effects on our modern living were unprecedented. And its disruption cost most industries— including the entertainment industry—dearly. While some then-extant forms of business-income disruption coverage were broad enough to cover some or all losses, those in this case were not. A creative mix of policy language and proffered scientific evidence does not change the fact that 14 of the 15 insurance contracts here did not cover the losses incurred with the shuttering occasioned by COVID-19's grip. And the Court cannot engage its discretionary authority to declare into those 14 policies that which just never made it therein. As to the fifteenth, that policy's language covered that show's interruption due to the COVID-19 shutdown from the interruption's start to finish, not in the segmented way that production now posits.

---

[263] *See generally Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) (Delaware courts cannot rewrite a contract to appease a party who later wishes a better deal had been struck); *Nationwide Emerging Managers, LLC v. Northpointe Hldgs., LLC*, 112 A.3d 878, 881 (Del. 2015) ("Delaware law requires that [a] contract's express terms be honored, and prevents a party who has after-the-fact regrets from . . . obtain[ing] in court what it could not get at the bargaining table.") (cleaned up).

The insurer here engaged in no misdoings when it provided the coverage the Tours' procured or when it made the now-contested coverage decisions.

For these reasons—as they are more fully explicated above—Hartford is **GRANTED** summary judgment on each of the seven counts leveled against it.

**IT IS SO ORDERED.**

_____
Paul R. Wallace, Judge

Original to Prothonotary
cc:  All counsel via File & Serve